# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

No. 24-1200

————————————

### UNITED STATES,
Appellee

v.

### SEAN O'DONOVAN,
Defendant-Appellant

————————————

**On Appeal from a Judgment of Conviction in the United States District Court for the District of Massachusetts**

————————————

**BRIEF OF DEFENDANT-APPELLANT SEAN O'DONOVAN**

————————————

**KIMBERLY HOMAN**
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

**MARTIN G. WEINBERG**
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
    AND APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . .    1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . .    1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    Procedural Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

I.    THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT
    THE CHARGED COMMUNICATIONS WERE TRANSMITTED
    IN INTERSTATE COMMERCE . . . . . . . . . . . . . . . . . . . . . . . . . .    14

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

    B.    Testimony that iMessages Are Transmitted Via the Internet,
        Without More, is Insufficient to Prove that the iMessages
        Were Transmitted In Interstate Commerce . . . . . . . . . . . . . .    18

    C.    Even Should this Court Conclude That Use of the Internet,
        Standing Alone, Suffices to Satisfy the Interstate
        Commerce Element of §1343, Davis' Testimony Should
        Have Been Stricken, Leaving the Record Devoid of
        Evidence That the Charged Messages Were in Interstate
        Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

        1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

        2.    How iMessages are transmitted from one iPhone
            to another requires expert testimony . . . . . . . . . . . . .    24

3.  There was no other permissible basis for the
    admission of Davis' testimony . . . . . . . . . . . . . . . . .   26

II.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
      O'DONOVAN'S CONVICTION ON COUNT ONE . . . . . . . . . .   29

      A.   The Post-*Skilling* Honest Services Fraud Landscape . . . . .   29

      B.   There Was No Evidence of a Quid-Pro-Quo Bribery
           Agreement (Or Even the Perception of One) as of
           April 26, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

      C.   Even Were A Scheme to Commit Honest Services Fraud
           in Existence as of April 26, O'Donovan's iMessage to
           Pollock Had no Capacity to Further It . . . . . . . . . . . . . . . .   34

III.  THE DISTRICT COURT ERRED IN DECLINING TO
      INSTRUCT THE JURY ON THE DEFENSE OF ENTRAPMENT.   35

      A.   The Elements of the Entrapment Defense . . . . . . . . . . . . . . .   37

           1.   The defendant's modest burden . . . . . . . . . . . . . . . . . .   37

           2.   Inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

           3.   Predisposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

      B.   The Record Evidence Warranted an Entrapment Instruction .   40

           1.   Inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

           2.   Predisposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

           3.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

IV.   THE COURT ERRED IN EXCLUDING THE TESTIMONY
      OF PROFFERED DEFENSE WITNESSES . . . . . . . . . . . . . . . .   51

V.    THE DISTRICT COURT ERRED IN DECLINING TO
INSTRUCT THE JURY THAT CONVICTION UNDER
18 U.S.C. §666 REQUIRES AN INTENT TO INFLUENCE
AN OFFICIAL ACT BY THE PAYEE . . . . . . . . . . . . . . . . . . . .    56

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56

    B.    The *McDonnell* "Official Acts" Definition . . . . . . . . . . . .    57

    C.    Section 666 Should Be Construed to Include an
Official Act Requirement . . . . . . . . . . . . . . . . . . . . . . . . .    59

    D.    The Error Was Not Harmless . . . . . . . . . . . . . . . . . . . . . .    67

VI.    THE COURT'S INSTRUCTIONS TO THE JURY WERE
ERRONEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70

    A.    The Court's Instructions Regarding Honest Services
Fraud Erroneously Suggested to the Jury That it Could
Find the Fraud Element of Honest Services Fraud
Satisfied If it Found That O'Donovan Made Material
Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70

    B.    The Instructions Failed to Convey the Requirement
of a *Quid-Pro-Quo* Agreement . . . . . . . . . . . . . . . . . . . . . .    72

    C.    The Instructions Regarding the §666 Count Erroneously
Defined the "Quo" Required . . . . . . . . . . . . . . . . . . . . . . .    75

    E.    Cumulative Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    76

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    78

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . .    79
CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    80
ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Dimora v. United States*, 973 F.3d 496 (6th Cir. 2020) . . . . . . . . . . . .       60

*Evans v. United States*, 504 U.S. 255 (1992) . . . . . . . . . . . . . . . . . . . . .       59

*Fischer v. United States*, 529 U.S. 667 (2000) . . . . . . . . . . . . . . . . . . . .       63

*Franchina v. City of Providence*, 881 F.3d 32 (1st Cir. 2018) . . . . . . . .       54

*Jacobson v. United States*, 503 U.S. 540 (1992) . . . . . . . . . . . . . . . . . .       39

*Keywords, LLC v. Internet Shopping Enterprises, Inc.*,
    2005 WL 8156437 (C.D. Cal. June 29, 2005) . . . . . . . . . . . . . . .       25

*Mathews v. United States*, 485 U.S. 58 (1988) . . . . . . . . . . . . . . . . . . . .       36

*McDonnell v. United States*, 579 U.S. 550 (2016) . . . . . . . . . . . . . . . . .   1, 12, 56,
                                                     57, 58, 64,
                                                       65, 67

*O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009) . . . . . . . . . . . . . . .       14

*Percoco v. United States*, 598 U.S. 319 (2023) . . . . . . . . . . . . . . . . . . . .       40

*Sabri v. United States*, 541 U.S. 600 (2004) . . . . . . . . . . . . . . . . . . . . . .       61

*Salinas v. United States*, 522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . . . 61, 63, 65,
                                                             66

*Skilling v. United States*, 561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . .       29

*Snyder v. United States*, No. 23-108, 2023 WL 8605740
    (U.S. December 13, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       62

*Swajian v. General Motors Corp.*, 916 F.2d 31 (1st Cir. 1990) . . . . . . .     25

*United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) . . . . . . . . . . . . . .     63

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) . . . . . . . . . . . . . .     29, 62, 67

*United States v. Baptiste*, 8 F.4th 30 (1st Cir. 2021) . . . . . . . . . . . . . . .     76

*United States v. Benjamin*, 94 F.4th 60 (2d Cir. 2024) . . . . . . . . . . . . .     63

*United States v. Biyiklioglu*, 652 Fed. App'x 274 (5th Cir. 2016) . . . . .     18

*United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) . . . . . . . . . . . . .     60

*United States v. Brown*, 540 F,2d 364 (8th Cir. 1076) . . . . . . . . . . . . . .     30

*United States v. Carrasco*, 79 F.4th 153 (1st Cir. 2023) . . . . . . . . . . . .     56, 59

*United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997) . . . . . . . . . . . . .     20, 21

*United States v. Chastain*, 979 F.3d 586 (8th Cir. 2020) . . . . . . . . . . .     60

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022) . . . . . . . . . . . . . .     31, 59

*United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005) . . . .     59

*United States v. DeSimone*, 488 F.3d 561 (1st Cir. 2007) . . . . . . . . . . .     55

*United States v. DiMizio*, 2012 WL 1020045
    (E.D.N.Y. March 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     30

*United States v. Dunston*, 851 F.3d 91 (1st Cir. 2017) . . . . . . . . . . . . .     28

*United States v. Falcon-Nieves*, 79 F.4th 116 (1st Cir. 2023) . . . . . . . .     60

*United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019) . . . . . . . . . . . . . .     60

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . . 31, 56, 61, 62, 63, 72

*United States v. Gamache*, 156 F.3d 1 (1st Cir. 1998) . . . . . . . . . . . . . . 38, 39, 40

*United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) . . . . . . . . . . 25, 28

*United States v. George*, 761 F.3d 42 (1st Cir. 2015) . . . . . . . . . . . . . . 27

*United States v. Gibson*, 675 F.2d 825 (6th Cir. 1982) . . . . . . . . . . . . . 55

*United States v. Habibi*, 783 F.3d 1 (1st Cir. 2015) . . . . . . . . . . . . . . . 27

*United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) . . . . . . . . . . . . 12, 61, 63, 66

*United States v. Hebshie*, 549 F.3d 30 (1st Cir. 2008) . . . . . . . . . . . . . 35

*United States v. Henry*, 848 F.3d 1 (1st Cir. 2017) . . . . . . . . . . . . . . . 56

*United States v. Hill*, 818 F.3d 289 (7th Cir. 2016) . . . . . . . . . . . . . . . 25

*United States v. Hilton*, 257 F.3d 50 (1st Cir. 2001) . . . . . . . . . . . . . . 20, 21

*United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996) . . . . . . . . . . . 23

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998) . . . . . . . . . . . 63

*United States v. Joost*, 92 F.3d 7 (1st Cir. 1996) . . . . . . . . . . . . . . . . . 39

*United States v. Kieffer*, 681 F.3d 1143 (10th Cir. 2012) . . . . . . . . . . . 18

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) . . . . . . . . . . . . . . . 60

*United States v. Legarda*, 17 F.3d 496 (1st Cir. 1994) . . . . . . . . . . . . . 54

*United States v. Lewis*, 554 F.3d 208 (1st Cir. 2009) . . . . . . . . . . . . . . 14, 19, 20, 21, 22

*United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022) . . . . . . . . . . . . 56, 59, 63, 65, 67

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002) . . . . . . . . . . . 66

*United States v. MacEwan*, 445 F.3d 237 (3rd Cir. 2006) . . . . . . . . . . 20, 21

*United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979) . . . . . . . . . . . 30

*United States v. Martinez*, 994 F.3d  1 (1st Cir. 2021) . . . . . . . . . . . . . 56

*United States v. Mayweather*, 991 F.3d 1163 (11th Cir. 2021) . . . . . . . 60

*United States v. Maxwell*, 42 M.J. 568 (U.S.A.F.C.A. 1995) . . . . . . . . 20

*United States v. McClain*, 934 F.2d 822 (7th Cir.  1991) . . . . . . . . . . . . 40

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) . . . . . . . . . . 31, 72

*United States v. McLellan*, 959 F.3d 442 (1st Cir. 2020) . . . . . . . . . . . 34

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) . . . . . . . . . . . 63

*United States v. Meserve*, 271 F.3d 314 (1st Cir. 2001) . . . . . . . . . . . . 54

*United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020) . . . . . . 25, 28

*United States v. Natal*, 849 F.3d 530 (2d Cir. 2017) . . . . . . . . . . . . . . . 25

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) . . . . . . . . . 57, 59, 60, 63, 65

*United States v. Padilla-Galarza*, 990 F.3d 60 (1st Cir. 2021) . . . . . . . 77

*United States v. Paiva*, 892 F.2d 148 (1st Cir. 1989) . . . . . . . . . . . . . .     27

*United States v. Perez-Melendez*, 599 F.3d 31 (1st Cir. 2010) . . . . . . . .     14

*United States v. Perez-Rodriguez*, 13 F.4th 1 (1st Cir. 2021) . . . . . . . . . 11, 36, 37,
38, 39, 50

*United States v. Phillips*, 376 F.Supp.2d 6 (D.Mass. 2005) . . . . . . . . . . .     19

*United States v. Pires*, 642 F.3d 1 (1st Cir. 2011) . . . . . . . . . . . . . . . .     52

*United States v. Porter*, 886 F.3d 562  (6th Cir. 2018) . . . . . . . . . . . . . .   57, 63

*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) . . . . . . . . . . . . .     31

*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017) . . . . . . . . . . . . . . .     60

*United States v. Reyes*, 24 F.4th 1 (1st Cir. 2022) . . . . . . . . . . . . . . . . .   23, 26

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021) . . . . . . . . . .   57, 59

*United States v. Rodriguez*, 858 F.2d 809 (1st Cir.  1988) . . . . . . . . . . . .11, 37, 38,
51

*United States v. Rosado-Perez*, 605 F.3d 48 (1st Cir.  2010) . . . . . . . . . .     27

*United States v. Rosario-Diaz*, 202 F.3d 54 (1st Cir. 2000) . . . . . . . . . . .     53

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002) . . . . . . . . . . . . . .     20

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) . . . . . . . . . . .     77

*United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) . . . . . . . . . . . . . . .     60

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) . . . . . . . . . . . . . .     63

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . .     30

viii

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) . . . . . . . .   31

*United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) . . . . . . . . . . . . .   34

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) . . . . . . . . . . . . .   31

*United States v. Thomas*, 74 F.3d 568 (6th Cir. 1996) . . . . . . . . . . . .   20

*United States v. Tum*, 707 F.3d 68 (1st Cir. 2013) . . . . . . . . . . . . . . .   14

*United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008) . . . . . . . . . . .   29

*United States v. Valdivia*, 680 F.3d 33 (1st Cir. 2012) . . . . . . . . . . . .   25

*United States v. Vega*, 813 F.3d 386 (1st Cir. 2016). . . . . . . . . . . . . .   28

*United States v. Wright*, 937 F.3d 8 (1st Cir. 2019) . . . . . . . . . . . . . .   70

*United States v. Wright*, 625 F.3d 583 (9th Cir. 2010) . . . . . . . . . . . .   21

*United States v. Yeley-Davis*, 632 F.3d 673 (10th Cir. 2011) . . . . . . . .   25

*Woodward v. United States*, 905 F.3d 40 (1st Cir. 2018) . . . . . . . . . . .   60

## Statutes and Rules

18 U.S.C. §201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61, 62

18 U.S.C. §215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

18 U.S.C. §666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 10. 23

18 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 29,30

18 U.S.C. §1465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

18 U.S.C. §1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. §2251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 2252(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Crim. P. 16(a)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 23, 24, 25, 27, 28

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 23, 24, 25

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## **Other Authority**

S.Rep. No. 98-225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal arises from a judgment of the district court entered on February 28, 2024, Add:1; appellant's timely notice of appeal was filed the same day. App:712. The district court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1. Whether use of the internet, standing alone, suffices to prove the interstate commerce element of 18 U.S.C. §1343.

2. Whether there was sufficient evidence to support O'Donovan's conviction on Count One.

3. Whether the district court erred in denying an entrapment instruction.

4. Whether the court erred in excluding the testimony of proffered defense witnesses.

5. Whether 18 U.S.C. §666 requires proof that the defendant offered or agreed to exchange something of value for an official act, as defined by *McDonnell v. United States*, 579 U.S. 550 (2016).

6. Whether the court's instructions to the jury were erroneous.

# STATEMENT OF THE CASE

## Procedural Overview

O'Donovan, an experienced and respected attorney, was charged in a three count indictment with honest services fraud, 18 U.S.C. §§1343, 1346 (Counts One and Two) and federal program bribery, 18 U.S.C. §666 (Count Three). Those charges stemmed from O'Donovan's taped meetings with government informant Michael Buckley ("Buckley"), the brother of John Buckley, Medford's Chief of Police ("the Chief") and a member of Medford's Cannabis Advisory Committee ("CAC"). According to the government, those communications constituted bribery—an attempt by O'Donovan to corruptly secure the Chief's favorable action on his client's application in exchange for payments to his brother. O'Donovan contended, however, that those interactions were simply an attempt on his part to ensure that the application of his client, Theory Wellness ("Theory"), a well-regarded cannabis company, received careful and fair consideration and, potentially, support from the Chief if (and only if) he, in his independent judgment, ranked Theory's application favorably on its merits. In sum, that he had no intent to engage in *quid-pro-quo* bribery.

O'Donovan moved for a judgment of acquittal at the end of the government's case and at the close of all the evidence, which was denied. App:486, 499-509. Also

denied was a post-trial motion for judgment of acquittal and new trial. Doc. 167; App:22. O'Donovan was sentenced to a term of twenty-four months. O'Donovan's motion for release pending appeal remains pending in this Court.

## Trial Evidence[1]

After Massachusetts legalized recreational marijuana, the city of Medford elected to open a process for selecting the marijuana retailers who would be granted Host Community Agreements ("HCA"), a necessary step in obtaining state approval for opening a marijuana dispensary in Medford. To that end, it established the CAC, a five-member panel of which the Chief was a member. The function of the CAC was to review HCA applications, interview candidates, rank candidates according to the established ranking system, and then make non-binding recommendations to the mayor regarding which candidates should receive an HCA. App:292-98; 411-12. The final selection of the three candidates to be awarded HCAs lay within the mayor's sole discretion. App:411-12.

One of the prospective candidates was Theory Wellness, a well-established cannabis retailer that was already successfully operating cannabis dispensaries in Bridgewater, Chicopee, and Great Barrington. App:258-59. Having no experience with Medford, Theory's CEO, Brandon Pollock, hired O'Donovan to assist Theory

---

[1] Additional evidence is discussed in Sections I-III, *infra*.

in navigating the selection and approval process. Under that contract, O'Donovan was to be paid $7,500 a month until the end of the process and 1% of the profits thereafter if Theory succeeded in obtaining an HCA. App:282-88.

O'Donovan, Buckley, and the Chief had all grown up in the same neighborhood, and O'Donovan and Buckley had become friends when they both worked in Somerville government, O'Donovan as an alderman and Buckley as an administrative assistant to the mayor. App:87-88. On February 10, 2021, O'Donovan texted Buckley, asking if they could talk. App:95. The two met later that day. After some general conversation, O'Donovan told Buckley that he was working with a company seeking to open a cannabis shop in Medford and asked Buckley if he (Buckley) could talk to the Chief about it. O'Donovan said that he was not asking the Chief for any favors and that all he wanted was a fair shake for his client and to ensure that the company's application, which would be one among many, received a careful look. He told Buckley on this and numerous future occasions that Theory was a good company with a great deal to offer Medford. O'Donovan further told Buckley that he would make the effort worth Buckley's while, up to $25,000. App:99-101, 169-70, 178-80. Rather than simply saying no, Buckley said that he would think about it. App:190-91.

Buckley called the Chief late on February 11, 2021. App:104. As soon as

Buckley told the Chief that O'Donovan had offered him $25,000 (and before Buckley could explain to the Chief the limited nature of what O'Donovan was seeking on Theory's behalf), the Chief terminated the conversation and then contacted the FBI. App:414-18, 447-48. Buckley agreed to cooperate with the FBI, and Buckley, primed with FBI instructions regarding what he should say, recorded all subsequent conversations with O'Donovan.

On February 12, 2021, O'Donovan texted Buckley, telling him to leave the matter alone as he did not want "any backfire." App:106. The two met again on February 22, 2021, with the FBI having given Buckley "general guidelines" regarding what he should say. App:111-13. O'Donovan told Buckley that he wanted to "try to get the edge," as he knew all the other candidates were, but he did not want to approach the Chief if it "would put him in a bad spot." App:650-51. O'Donovan told Buckley that he could guarantee $25,000 and perhaps even $50,000 if Theory were successful (but nothing if they were not). App:652. O'Donovan was concerned that the decision would be made based on local influence rather than a fair evaluation of the merits of the applications. App:201-02. All O'Donovan asked for at this meeting was that the Chief vote on Theory's application based on his own independent assessment of its merits. App:206.

On April 16, 2021, Buckley texted O'Donovan at the instigation of the FBI and

asked to meet, telling him untruthfully, at the FBI's direction, that he had spoken with the Chief. App:122, 207. The two met again on April 26, 2021. App:123. During that conversation, O'Donovan said several times that he only wanted a fair shake for Theory and for the Chief to take an honest look. App:124, 214. O'Donovan told Buckley that he would walk away and not ask the Chief to do anything if the Chief did not like Theory's application. *Id.* At the FBI's instruction, Buckley told O'Donovan that the Chief was not a fan of marijuana and hated being on the CAC, which reinforced O'Donovan's fear that the Chief might not read the applications carefully. App:209-10. O'Donovan was also concerned that the mayor would choose a local favorite, App:214-15, and believed that the Chief's opinion would weigh heavily with the mayor. App:660.

Throughout this time, O'Donovan and Pollock were communicating frequently about all the issues relating to Theory's application; O'Donovan was closely involved in the preparation of the application and obtaining local letters of support for Theory. App:305, 310. On April 26, O'Donovan texted Pollock, saying "working this thing hard just so you know my friend." App:311.[2] Theory's application was filed on April 27, 2021. App:310. O'Donovan had not told Pollock about his conversations with

---

[2] This April 26 communication is the subject of Count One. App:37. O'Donovan argues in Section II, *infra*, that the evidence did not suffice to prove that he was engaged in *quid-pro-quo* bribery as of that date.

Buckley. App:307-11.

O'Donovan and Buckley had no further contact until August 28, 2021, when O'Donovan texted Buckley to say, "It's time." Buckley, at the direction of the FBI, responded by asking what O'Donovan wanted him to do; O'Donovan told him to tell the Chief "to vote Theory Number 1 and say I'm the best candidate for Medford legitimately." App:130. On the instruction of the FBI, Buckley suggested that the two meet. App:130-31.

At their meeting on September 14, 2021, Buckley told O'Donovan, at the direction of the FBI, that Medford's former mayor had approached the Chief on behalf of a competitor. App:139, 219. Buckley raised the question of money, on the FBI's instructions, falsely telling O'Donovan that he had told the Chief that he was going to be paid, that the Chief wanted to help him out because he had financial problems, but that the Chief wanted to be sure Buckley would be paid, which then led to a discussion of how Buckley might be paid. App:140-41, 222-25, 669-71. O'Donovan expressed his understanding that Buckley wanted to be paid in cash, saying, "[y]ou don't want it in a check, right?" Buckley responded, "[n]o, no, no," and said that he did not want anything "that's going to trace." App:670. Buckley believed that O'Donovan was telling him that the money would come from Theory. App:141. O'Donovan told Buckley to ask the Chief to score Theory highly, talk to

the mayor about Theory, and ask the mayor to speed up the process. App:141-42. On September 21, 2021, O'Donovan asked Pollock to hire Buckley as a security consultant, and Pollock said he would think about it. App:137.

Buckley again, at FBI's instruction, asked to meet with O'Donovan, and the two met on September 29, 2021. On the FBI's instructions, Buckley told O'Donovan that the Chief had not ranked Theory in the top three because he was bothered by an Attorney General's investigation of Theory but that he would change his vote if Buckley were paid. In fact, the Chief had ranked Theory number one. App:226. In response, O'Donovan said "Beautiful" and "Perfect" and, according to Buckley, gave him a fist bump. Further at the direction of the FBI, Buckley told O'Donovan that the Chief was insisting that Buckley receive some of the money up front. The two then discussed various ways in which Buckley might be paid, including representing it as payment on a consulting contract. App:147-48. Shortly after this meeting, O'Donovan called Buckley and offered him a $5,000 loan, with the understanding that it would have to be repaid if Theory were not successful but that he would receive another $20,000 if Theory were successful. App:150.

The two agreed to meet the following week, the day before the then-scheduled

public release of the rankings,[3] for O'Donovan to give Buckley a check, but O'Donovan then made excuses for why he could not do so. App:151-52, 470. On October 7, 2021, O'Donovan texted Pollock, asking permission to hire a consultant for $25,000, to be paid on success and recommending that Theory do so. App:321. Pollock subsequently told O'Donovan that he was not interested in hiring a consultant because it was inappropriate, the idea made him uncomfortable, and Theory was an above-board company. App:324. O'Donovan told Buckley later that day that Pollock was afraid and that Theory now wanted to pay Buckley $15,000 (the net after taxes) if Theory were successful, with $5,000 up front, which would have to be repaid if Theory were not. App:153-54. O'Donovan had not, however, had such a conversation with Pollock. App:326.

The two met again on October 11, 2021, and O'Donovan gave Buckley $2,000 in cash, saying that Pollock did not want to pay $5,000 and then have to retrieve it if Theory were not successful. App:157-58. O'Donovan had not had such a conversation with Pollock, nor had he told him about any payments to Buckley. App:328-29.

The rankings were released publicly on October 13, 2021. App:428. Theory

---

[3] Because O'Donovan had not yet succumbed to Buckley's demand for up-front money, the FBI caused the public release of the rankings to be delayed for another week. App:470.

was ranked number one by the Chief and all four other CAC members and was selected by the mayor to receive an HCA. App:329-30.

## SUMMARY OF ARGUMENT

I(A). 18 U.S.C. §1343 criminalizes wire fraud only in those cases where communications are transmitted "in interstate or foreign commerce." To prove this essential element of the offense, the government must show, beyond a reasonable doubt, that the communications crossed state lines. Here, the only evidence introduced by the government was testimony by a non-expert that iMessages are transmitted via the internet through servers; the government introduced no evidence of the location of Apple's servers. This evidence did not suffice to prove the interstate commerce element, and O'Donovan's convictions on Counts One and Two should be reversed.

I(B). Even should this Court conclude that use of the internet alone satisfies the interstate commerce element, the testimony regarding the involvement of the internet should have been stricken because: (1) how communications are transmitted via the internet requires expert testimony subject to Fed. R. Evid. 702; (2) the testimony was not based on the witness' personal knowledge and was, therefore, inadmissible under Fed. R. Evid. 701.

II. The evidence did not suffice to support O'Donovan's conviction on Count

One. There was no evidence that as of April 26, 2021, the date of the communication charged in Count One, that O'Donovan had entered into an agreement with the Chief (or believed that he had done so) in which he would exchange payments to Buckley for the Chief's official acts. Accordingly, O'Donovan's conviction on Count One should be reversed.

III. The district court erred in declining to give an entrapment instruction. The defendant has a "modest burden" to show a "plausible" or "superficially reasonable" entrapment theory, based on the evidence at trial, that the government induced the commission of the offenses charged and that he was not predisposed to commit *quid-pro-quo* bribery. *See United States v. Perez-Rodriguez*, 13 F.4th 1, 17, 19 (1st Cir. 2021); *United States v. Rodriguez*, 858 F.2d 809, 814 (1st Cir. 1988). In evaluating the defendant's entitlement to an entrapment instruction, courts must construe the evidence in the light most favorable to the defendant and draw all reasonable inferences in favor of the defendant's entrapment theory. O'Donovan has met his burden to show that the FBI, through its manipulation of communications between Buckley and O'Donovan, induced the commission of what the jury found to be *quid-pro-quo* bribery and that he was not predisposed to commit the crimes charged. His convictions should, accordingly, be vacated.

IV. The court erred in excluding the testimony of two defense witnesses who

would have provided substantial support for O'Donovan's defenses of good faith and lack of intent to commit *quid-pro-quo* bribery. The proffered evidence was relevant and not excludable as hearsay, as it was not offered for its truth.

V. The district court erred in declining to instruct the jury that conviction under 18 U.S.C. §666 requires an intent to influence an official act by the payee. This is a question of first impression in this circuit. While some other circuits have rejected the argument that §666 incorporates an official act requirement, this Court has in several prior cases proceeded on the assumption that it does. That §666 does not include the words "official act" is simply the beginning of the inquiry, not the end. Failing to construe §666 to include an official act requirement would subject state and local officials to prosecution for a broader range of conduct than does §201(b), which was surely not Congress' intent, as "Congress' interest in federal officials taking bribes is higher than its interest in local officials (with some connection to federal funds) doing the same." *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022). Moreover, the failure to construe §666 to include an official act requirement raises the same significant constitutional concerns that led the Supreme Court to narrow the definition of "official act" in *McDonnell v. United States*, 579 U.S. 550 (2016). Accordingly, the court erred in declining to instruct the jury that O'Donovan must have had the intent to influence an official act by the Chief, and that error was not

harmless.

VI. The court's instructions to the jury were erroneous in three critical respects: (1) they erroneously suggested to the jury that it could convict O'Donovan of honest services fraud based upon his making of material misrepresentations; (2) they permitted the jury to convict O'Donovan of *quid-pro-quo* bribery without finding that O'Donovan had, or believed that he had, entered into an agreement with the Chief to exchange payments to Buckley for favorable action on Theory's application; (3) the court's §666 instructions erroneously diluted the "quo" requirement by telling the jury that it could convict O'Donovan on Count Three if it found that the Chief "would in some way . . . give an edge to Theory." These errors were not harmless. Even should this Court decide that none of these errors were sufficiently prejudicial to warrant vacating O'Donovan's convictions, the Court should nonetheless vacate O'Donovan's convictions under the cumulative error doctrine.

## ARGUMENT

### I. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT THE CHARGED COMMUNICATIONS WERE TRANSMITTED IN INTERSTATE COMMERCE.[4]

18 U.S.C. §1343 criminalizes wire fraud only in those cases in which the defendant, "having devised or intending to devise any scheme or artifice to defraud . . . transmits or causes to be transmitted by means of wire . . . communication *in interstate or foreign commerce*, any writings. . . for the purpose of executing such scheme or artifice" (emphasis added). Section 1343 "has long been held to require actual crossing of a state . . . border." *United States v. Lewis*, 554 F.3d 208, 213 (1st Cir. 2009). *See, e.g., United States v. Tum*, 707 F.3d 68, 74 (1st Cir. 2013)("Of course, the communication actually had to have crossed state lines."). Here, however, rather than prove that the two charged communications crossed state lines, the government offered only testimony that the messages had traveled via the internet.

That evidence does not suffice to prove the essential interstate commerce element of wire fraud. O'Donovan's convictions on Counts One and Two should,

---

[4] This Court reviews the denial of a motion for judgment of acquittal de novo. *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). The question for the Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 (1st Cir. 2009).

accordingly, be reversed. Alternatively, even if the Court should conclude that use of the internet sufficed to prove that the communications were transmitted in interstate commerce, the testimony regarding the involvement of the internet should have been stricken because: (1) how communications are transmitted via the internet requires expert testimony subject to Fed. R. Evid. 702; (2) the testimony was not based on the witness' personal knowledge and was, therefore, inadmissible under Fed. R. Evid. 701. Absent that testimony, no reasonable jury could find the interstate commerce element established beyond a reasonable doubt.

## A.    Background.

The two charged communications were iMessages sent between O'Donovan's Apple phone and that of Brandon Pollock when both men were located in Massachusetts. App:37.[5] Seeking to prove the interstate commerce element, the government called a local Apple store employee to testify regarding the location of Apple's servers. App:391-92. When it became evident on cross-examination that the witness had no personal knowledge of the location of Apple's servers but was instead relying on what he had been told by unnamed others, *see* App:397-99, the court

---

[5] Pollock testified that he was in Massachusetts when he received the charged iMessages. App:311, 321. Both of the charged messages were sent on days when O'Donovan met with Buckley in Massachusetts, App:123-24, 153, establishing his location in Massachusetts when the messages were sent.

struck the testimony. App:399-402. The court opined, however, that striking the testimony did not prevent the government from prevailing on the issue "because there is sufficient evidence . . . that wire communications in the United States were used." App:399. The government, apparently believing—correctly—that the evidence did not in fact suffice to satisfy its burden of proof on the interstate commerce element, reserved the right, with the court's permission, to "submit a document from Apple that says where their servers are." App:400; *see* App:485 (government rests "subject to potentially providing more information on the Apple servers"). No such document was ever presented.

During the charge conference, the court reiterated its belief that even without evidence of the location of Apple's servers, there was sufficient evidence "from which the jury could find that the wire communications of the United States were used." App:519. O'Donovan objected to this formulation of the interstate commerce element. App:523. The government agreed that "a communication does have to cross state lines," but contended that the evidence was sufficient because "it is reasonably foreseeable that an Apple iMessage is going to transmit outside of the state of Massachusetts." App:524.

Thereafter, the court permitted the government to recall Cameron Davis, an FBI digital forensics examiner, who testified, over objection, that "imessages travel over

the internet through servers." App:541-43. On cross-examination, Davis admitted that he had no personal knowledge regarding the location of Apple's servers but was instead relying on what he had been told by unnamed persons in unidentified training classes. App:544-46. The court denied the defense motion to strike the testimony, treated the motion for judgment of acquittal as having been renewed, and again denied the motion. App:546.

The court instructed the jury that "the wire communication must be in some form or fashion interstate, a wire communication of the United States." App:568. In response to the jury's question whether wire fraud required that the messages have crossed state lines, the court responded: "[Y]es the message at some point in its transmission has to cross state lines, and that must be proved beyond a reasonable doubt." App:605. Later, the jury asked again whether it needed to believe that the charged messages "went across state lines for it to be considered wire fraud." Yes, the court responded, the government "has to produce evidence" that the message "[went] out of state and then back in state," and "[t]he evidence you have is evidence about the internet." App:628.

O'Donovan again moved post-trial for a judgment of acquittal on the grounds, *inter alia*, that Davis' testimony should have been stricken and that the evidence did not suffice to prove the interstate commerce element. Doc. 167 at 2-5. That motion

was also denied. App:19.

**B.    Testimony that iMessages Are Transmitted Via the Internet, Without More, is Insufficient to Prove that the iMessages Were Transmitted In Interstate Commerce.**

Proof of nothing more than generalized use of the internet does not suffice to prove beyond a reasonable doubt that the charged communications crossed state lines where both the sender and the recipient of the iMessages were located in the same state at the time of their transmission. Two circuits have held that it does not, *see, e.g., United States v. Biyiklioglu*, 652 Fed. App'x 274, 281 (5th Cir. 2016); *United States v. Kieffer*, 681 F.3d 1143, 1155 (10th Cir. 2012), and no circuit has held in a published opinion construing the interstate commerce element of §1343 that use of the internet, without more, suffices to prove that messages crossed state lines. It does not appear that this Court has considered the issue.

Section 1343 is not cast in terms of using the facilities of interstate commerce but instead requires that the communications be *in* interstate commerce, which requires that the transmission have crossed state lines. Permitting evidence of internet use to suffice to prove that communications were transmitted in interstate commerce would effectively eliminate the congressionally-mandated distinction between statutes requiring that the transmission at issue be *in* interstate commerce—statutes that impose a stricter burden of proof on the government—and statutes that

18

criminalize the use of the facilities or instrumentalities of interstate commerce, which relax the government's burden of proof. Indeed, Congress has twice declined to expand the jurisdictional nexus of §1343 to encompass use of instrumentalities of interstate commerce. *See United States v. Phillips*, 376 F.Supp.2d 6, 8 (D.Mass. 2005)(holding that §1343 requires proof that communication crossed state lines).

In *United States v. Lewis*, 554 F.3d 208 (1st Cir. 2009), this Court considered whether use of the internet sufficed to prove the interstate commerce element of 18 U.S.C. § 2252(a)(2), which criminalized receiving or distributing child pornography that "has been shipped or transported in interstate or foreign commerce." The Court rejected the government's argument that it was not required to show that the transmission crossed state lines, *id.* at 213-14, but concluded that proof that the defendant downloaded child pornography through the internet satisfied the jurisdictional prerequisite. The Court explained at length how files are routed through the internet, emphasizing that, once files are launched into the ether, the system will route it through the fastest possible channel, which could be anywhere in the country or even the world. *Id.* at 210. That being the case, it was impossible to know what path any particular transmission followed. *Id.*

That impossibility, and evidence demonstrating the likelihood that any given internet transmission would in fact cross state lines even if the sender and receiver

were located in the same state, led the Court to conclude, drawing on two prior

decisions—*United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997), and *United States*

*v. Hilton*, 257 F.3d 50 (1st Cir. 2001)—that "the government may satisfy the

interstate commerce element by proving that child pornography images were

transmitted over the internet." *Lewis*, 554 F.3d at 215.[6]  The *Lewis* Court noted that

two other circuits had reached similar conclusions, citing *United States v. MacEwan*,

445 F.3d 237 (3rd Cir. 2006), and *United States v. Runyan*, 290 F.3d 223 (5th Cir.

2002). *MacEwan*, like *Lewis*, relied on the impossibility of knowing just how any

given transmission had moved through cyberspace. 445 F.3d at 244. *Lewis* and

---

[6] *Carroll* was a dubious precedent for several reasons. First, 18 U.S.C. §2251(a), the statute at issue there, had a considerably broader definition of the interstate commerce element than the statute at issue in *Carroll*; §2251(a) extended the interstate commerce element to include not just actual transportation of child pornography in interstate commerce, but also knowing or having reason to know that the images would be transported in interstate commerce. 105 F.3d at 741. Second, there was direct evidence of the defendant's intent to transport the images across state lines. *Id.* at 742. Third, the two cases on which *Carroll* relied for the proposition that "[t]ransmission of photographs by means of the Internet is tantamount to moving photographs across state lines," *United States v. Thomas*, 74 F.3d 701, 706-07 (6th Cir. 1996), and *United States v. Maxwell*, 42 M.J. 568, 580 (U.S.A.F.C.A.1995), *id.*, were both reviewing convictions under 18 U.S.C. §1465, which criminalizes the use of *the facilities of interstate commerce* to transmit pornography, again, a considerably broader definition of the interstate commerce element than that found in §1343.

*MacEwan* are perhaps best understood as "stand[ing] for the proposition that, where it is impossible to determine whether the receipt of child pornography images crossed state lines, a defendant's use of the Internet may serve as a proxy for satisfying the interstate commerce requirement." *United States v. Wright*, 625 F.3d 583, 594-95 (9th Cir. 2010).

*Lewis* does not and cannot dictate the result in this case for a number of reasons. First, under the very different circumstances of this case, there was no impossibility of proof and, hence, no need for a proxy. Both Pollock and O'Donovan were located in Massachusetts when the iMessages were sent. The government presented no competent evidence regarding the location of Apple's servers, *i.e.*, whether there was one in Massachusetts or whether they were all located outside the state—evidence that it could have obtained but did not—or how iMessages are routed through Apple servers.

Second, in *Lewis*, *Carroll*, and *Hilton*, as well as in other cases, the government presented expert testimony, and in some cases, additional other evidence, based on which the jury could evaluate the likelihood that the communication had crossed state lines. Here, in sharp contrast, the jury was told nothing more than that iMessages travel via the internet using servers. Thus, the jury had no factual basis for assessing whether the government had satisfied its burden to prove beyond a reasonable doubt

that the charged messages had crossed state lines.

Third, Congress obviously has an interest in eliminating child pornography on a nationwide basis. A contrary decision in *Lewis* would have dramatically impeded the government's ability to prosecute child pornography offenses by foreclosing from prosecution one of the major avenues through which child pornography is distributed unless there was proof-positive that the transmission had actually crossed state lines. As *Lewis* noted, Congress, in response to cases that had required proof that child pornography had actually crossed state lines, later amended the statute to encompass all instrumentalities of interstate commerce, bringing within the statute's ambit all uses of the internet to transmit child pornography. 554 F.3d at 216. Congress has no comparable interest in using the Commerce Clause to prosecute purely local fraud.

The government's bare evidence that the charged messages were transmitted via the internet through servers does not suffice to prove that they crossed state lines. O'Donovan's convictions on Count One and Two should, accordingly, be reversed.

**C.** **Even Should this Court Conclude That Use of the Internet, Standing Alone, Suffices to Satisfy the Interstate Commerce Element of §1343, Davis' Testimony Should Have Been Stricken, Leaving the Record Devoid of Evidence That the Charged Messages Were in Interstate Commerce.[7]**

Davis was not called as an expert witness, and the defense had no prior notice of the substance of his testimony or its bases, as would have been required by Rule 16(a)(1)(G) had he been. Because his testimony regarding how iPhones send messages to other iPhones required "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701, it could only be offered through a qualified expert, which Davis was not, and subject to the requirements of Fed. R. Evid. 702. Nor was there any other permissible basis for the admission of his testimony. His testimony should, therefore, have been stricken. Absent that testimony, the evidence did not suffice to prove that the iMessages were transmitted in interstate commerce, and O'Donovan's convictions on Counts One and Two should be reversed.

**1.** **Background.**

When Davis was called originally to testify regarding the data he had retrieved from the relevant cell phones, he described his job as acquiring, preserving,

_____

[7] This Court reviews a district court's decision to admit evidence for abuse of discretion. *E.g., United States v. Reyes*, 24 F.4th 1, 21 (1st Cir. 2022); the same standard applies to the denial of motions to strike. *E.g., United States v. Houlihan*, 92 F.3d 1271, 1297 (1st Cir. 1996).

processing, and analyzing digital media, for which he had received forensic training. App:354-57. When Davis was recalled, the defense objected that it had not been notified until after midnight that the government intended to recall him and that Davis did not have personal knowledge of how iMessages were transmitted. As to the latter, the court responded, "[w]ell, we'll see if he does." App:535. As it turned out, he did not.

The court overruled the defense objection to Davis' testifying about how phones, and iPhones in particular, transmit messages from one phone to another. App:340-41. Davis then testified that he had learned through his "training and experience" that "imessages travel over the internet through servers," App:541, and that the charged messages had traveled over the internet. App:543. On cross-examination, the defense established that Davis had no personal knowledge regarding the location of Apple's servers and that the sole basis for his testimony was what he had been told by unnamed teachers in unspecified training courses. App:543-46. The defense moved to strike Davis' testimony, which was denied. App:546.

### 2. How iMessages are transmitted from one iPhone to another requires expert testimony.

Rule 701 was amended in 2000 to "eliminate the risk that the reliability requirements in Rule 702 will be evaded through the simple expedient of proffering

an expert witness in lay witness clothing." *United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012). "If the opinion rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005), citing Rule 701, Advisory Committee Notes to 2000 Amendments. How cell phones communicate with each other falls squarely in the domain of "scientific, technical, or other specialized knowledge," and therefore required expert testimony, as a number of courts have concluded. *See, e.g., United States v. Natal*, 849 F.3d 530, 536-37 (2d Cir. 2017)("[T]estimony on how cell phone towers operate must be offered by an expert witness."); *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016)(testimony about how cell phone towers operate "fits easily into the category of expert testimony"); *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011)("The agent's testimony concerning how cell phone towers operate constituted expert testimony because it involved specialized knowledge not readily accessible to any ordinary person."); *see Keywords, LLC v. Internet Shopping Enterprises, Inc*., 2005 WL 8156437, at *7 (C.D. Cal. June 29, 2005)(witness "has not demonstrated that he is qualified to offer an expert opinion regarding the manner in which data is routed between computers);*cf. United States v. Montijo-Maysonet*, 974 F.3d 34, 49 (1st Cir. 2020)(officer's testimony that government's forensic software could not recover KIK

text messages after they had been deleted was arguably expert testimony); *id.* at 50

n.13 (suggesting that allowing officer's testimony that KIK used the internet was

erroneous).

Davis was neither proffered nor qualified as an expert, nor based on the record,

could he have been. The experience he described was limited to extracting and

analyzing data *after* it had reached its destination and was contained within the device

he was examining. He was not shown to have had any expertise regarding how text

messages in general or iMessages in particular were transmitted. The district court

manifestly abused its discretion in refusing to strike Davis' testimony. The error in

the admission of Davis' testimony cannot be found harmless, as it was the only

evidence relating to the interstate commerce element. Absent Davis' testimony, there

was *no* evidence that would permit a rational jury to find the interstate commerce

element of §1343 proven beyond a reasonable doubt.

> **3.** **There was no other permissible basis for the admission of Davis' testimony.**

Davis' testimony was not admissible as lay witness testimony under Rule 701.

Lay witness testimony "must be (i) rationally based on the witness' perception; (ii)

"helpful to . . . determining a fact in issue;" and (iii) "not based on scientific,

technical, or other specialized knowledge." *Reyes*, 24 F.4th at 21 (citations omitted).

"As these are conjunctive requirements, lay witness testimony that fails to satisfy a single prong of Rule 701 is not properly admitted." *Id.* Davis' testimony failed to satisfy the first requirement—that testimony be based on personal knowledge. It is a "basic principle in the Federal Rules of Evidence that witnesses, other than experts giving expert opinions, should testify from personal knowledge." *United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010). *See, e.g., Swajian v. General Motors Corp.*, 916 F.2d 31, 36 (1st Cir. 1990)(without personal knowledge, witness' testimony "did not even begin to meet the requirements of Rule701"); *United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989)(to be admissible under Rule 701, testimony must be "well founded on personal knowledge"); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.")

Nothing in Davis' testimony indicates that he was testifying based on his personal knowledge. On the contrary, his testimony that iMessages are transmitted over the internet was nothing more than hearsay—what he had been told by someone whom he could not even identify. While this Court has often said that Rule 701 permits "testimony based on lay expertise a witness personally acquires through experience, often on the job," *United States v. Habibi*, 783 F.3d 1, 5 (1st Cir. 2015), *quoting United States v. George*, 761 F.3d 42, 59 (1st Cir. 2015), such testimony is

limited to that which is "well founded on . . . personal knowledge." *Montijo-Maysonet*, 974 F.3d at 48. *See United States v. Dunston*, 851 F.3d 91, 97 (1st Cir. 2017)(officer's "interpretive testimony must be anchored in the witness's personal experience in the field . . . and his experience-based understanding of the meaning of the terms used"). Not all "job-based knowledge is nontechnical or nonspecialized." *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016). To be admissible under Rule 701, the lay expertise must be "the product of reasoning processes familiar to the average person in everyday life." *Id., quoting Garcia*, 413 F.3d at 215. For these reasons, the *Vega* court explained, the fact that the witnesses had learned about Medicare law through their occupations "d[id] not make it 'personal knowledge' qualifying as lay expertise under Rule 701." *Id.* at 395.

Thus, the fact that Davis learned through FBI training classes that iMessages travel over the internet does not make that information "personal knowledge" within the meaning of Rule 701. Nothing in Davis' testimony suggests that he had any first-hand experiential basis for his testimony regarding transmission of iMessages over the internet. Indeed, his cross-examination testimony made it clear that he did not. Because his testimony was not based on personal knowledge, it should have been stricken.

## II. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT O'DONOVAN'S CONVICTION ON COUNT ONE.

Count One charged O'Donovan with honest services fraud based on his April 26, 2021, iMessage to Pollock. *See* page 7, *supra*. The evidence was insufficient to support O'Donovan's conviction for two fundamental reasons: (1) the evidence did not show that O'Donovan had the specific intent to commit bribery as of that date, and (2) even assuming *arguendo* that such a scheme existed at that early date, the April 26 iMessage had no capacity to further it.

### A.    The Post-*Skilling* Honest Services Fraud Landscape.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court, in response to a vagueness challenge to 18 U.S.C. §1346, adopted a narrowing construction, limiting honest services fraud to "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 408-09 (emphasis in original). Thus, "*Skilling* embodies a narrower understanding of the meaning of 'bribery' for purposes of honest services fraud that cuts against concluding that . . . conduct . . . which does not fall '[i]n the main . . . [of] the pre-*McNally* cases,' is a 'bribe' in the sense meant by *Skilling*." *United States v. Abdelaziz*, 68 F.4th 1, 30 (1st Cir. 2023).

In support of its limiting construction, the *Skilling* Court cited this Court's decision in *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), in which this

Court gave "taking a bribe for a legislative vote" as an example of the "core misconduct covered by" §1346. 561 U.S. at 408. Other cases cited in *Skilling* as representative of this "core" are of similar import. *See, e.g., Shushan v. United States*, 117 F.2d 110, 114 (5th Cir. 1941)(involving alleged payments to members of the Levee Board); *United States v. Mandel*, 591 F.2d 1347, 1362 (4th Cir. 1979)(involving allegation that governor "in return for certain financial and other benefits, took certain positions on racetrack legislation that was before the Maryland legislature"); *see also United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008)("[I]n most honest services fraud cases, the defendant violates a fiduciary duty in return for cash—kickbacks, bribes, or other payments").

Thus, in the paradigmatic honest services fraud case, the public official receives a direct benefit in exchange for official action. The question therefore becomes whether and in what circumstances payments to a third party (here, Buckley) may subject an individual to criminal liability for honest services fraud bribery.[8] The

[8] In one case cited by the *Skilling* Court, in which the alleged bribes were rent payments for the defendant's girlfriend, the court acknowledged that such conduct "did not resemble the typical scenario in a mail fraud prosecution." *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976). There was, however, evidence that the rent payments benefitted the official, as he had committed himself to taking care of his girlfriend's rent. *Id.* at 369. *See United States v. DeMizio*, 2012 WL 1020045, at *1-*2 (E.D.N.Y. March 26, 2012)(motive for kickback scheme was to relieve defendant of obligation to assist family members financially using his own wealth by arranging for finder's fees to be paid to his father and brother).

answer lies in the very nature of *quid-pro-quo* bribery: an *exchange* of things of value for official acts. There can be no "exchange" with a public official if he does not even know about the payment to a third party, and, absent at least a perceived agreement to exchange payment for an official act, there can be no *quid-pro-quo* bribery.

Bribery requires "a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), *quoting United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999)(emphasis in original). *See, e.g.*, *United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022)("[A]s long as the agreement to exchange a thing of value for an official act is made before the act is performed, the requisite quid pro quo is established."); *United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021)(The parties to the bribe must "share an understanding that the payments were made in return for official action."); *United States v. McDonough*, 727 F.3d 143, 152 (1st Cir. 2013)("[T]he government must prove that an agreement for a quid pro quo existed."); *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013)("A flow of benefits from one person to a public official, to be sure, does not by itself establish bribery. The benefits instead must be part and parcel of an agreement by the beneficiary to perform public acts for the patron.").

## B. There Was No Evidence of a Quid-Pro-Quo Bribery Agreement (Or Even the Perception of One) as of April 26, 2021.

O'Donovan could not properly be convicted of honest services fraud as of April 26, 2021, because evidence that O'Donovan believed that he had entered into a *quid-pro-quo* exchange agreement with the Chief as of that date was wholly lacking. Indeed, the record is devoid of evidence that as that date, O'Donovan ever intended the Chief to know that he would be paying Buckley for his efforts to promote Theory's interests if Theory were successful. As of April 26, O'Donovan had done no more than tell Buckley what a good candidate Theory was and ask Buckley to ask the Chief to read Theory's application carefully and give it a "fair shake," in return for which he would give Buckley a thank-you payment if Theory were successful. Nothing that Buckley had said to O'Donovan to date would have given O'Donovan any reason to believe that the Chief had agreed (or would agree) to rank Theory highly in exchange for payments to Buckley, nor was there anything that O'Donovan had said or done that evinced an intention to enter into such an agreement. The Chief had not asked for payment to himself or Buckley, nor had he in any way indicated (as relayed to O'Donovan by Buckley) that he was amenable to exchanging his vote for payments that would assist his brother with his purported financial problems. Not until September 14, when the entrapment of O'Donovan was

well underway, *see* Section III, *infra*, did Buckley, at the direction of the FBI, tell O'Donovan that the Chief wanted to help him financially by ensuring that Buckley would be paid, and not until September 29 was there any offer by the Chief (in communications by Buckley to O'Donovan scripted by the FBI) to enter into a *quid-pro-quo* agreement in exchange for payments to Buckley.

Nothing said or done by O'Donovan up to and including his April 26 conversation with Buckley can support a reasonable inference, much less one beyond a reasonable doubt, that O'Donovan at any time prior to his April 26 iMessage to Pollock contemplated entering into a *quid-pro-quo* bribery agreement with the Chief. Indeed, O'Donovan told Buckley during their April 26 meeting that the Chief should *not* vote for Theory if he did not think its application merited it. App:663. During that meeting, O'Donovan suggested that Buckley tell the Chief that O'Donovan represented Theory, that Theory was a great company, that O'Donovan was asking that the Chief read the application and give Theory a fair shake, and that he was afraid no one would read the applications. App:663-64. This is, moreover, consistent with how Buckley described his interactions with O'Donovan up to and including April 26. Buckley may have speculated that O'Donovan actually wanted something more than what he repeatedly said that he did, but that cannot substitute for proof of O'Donovan's intent to commit bribery as of April 26.

In sum, the evidence failed to show that O'Donovan was guilty of honest services fraud on April 26, 2021. There was nothing here as of April 26 that fell within "the core honest services doctrine identified in *Skilling*." *Abdelaziz*, 68 F.4th at 26. Indeed, no such potential illegality arose until Buckley's communication of the Chief's purported offer to change his vote in exchange for the payments to Buckley on September 29, when, as addressed in Section III, *infra*, the government's entrapment of O'Donovan was nearly complete.

### C.    Even Were A Scheme to Commit Honest Services Fraud in Existence as of April 26, O'Donovan's iMessage to Pollock Had no Capacity to Further It.

To convict a defendant of wire fraud, the government must prove (1) the existence of a scheme to defraud; (2) the defendant's knowing and willful participation in the scheme with the intent to defraud; and (3) the use of interstate or foreign wire communications *to further that scheme. See, e.g., United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020)(emphasis added). The wire fraud statute "does not purport to reach all frauds, but only those limited instances in which the use of the [wires] is a part of the execution of the fraud." *United States v. Tavares*, 844 F.3d 46, 58 (1st Cir. 2016). The wire "must at least have some tendency to facilitate the execution of the fraud." *Id.* at 59.

Even had such a scheme existed as of April 26, O'Donovan's iMessage telling

34

Pollock only that he was "[w]orking this thing hard just so you know my friend" had no capacity to further any such scheme. It was neither "incident to an essential part of the scheme" nor "a step in [the] plot," such that "the scheme's completion . . . depended in some way on the [wire]." *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008). Pollock was at that time entirely unaware of O'Donovan's interactions with Buckley. O'Donovan was working for Theory on a monthly retainer, and it was his obligation under that contract to "work[] this thing hard," as he had been doing in the preparation of Theory's application and gathering local letters of support. App:310. Merely assuring Pollock that he was continuing to fulfill his obligations under the contract could not facilitate a bribery scheme of which Pollock was unaware.

## III. THE DISTRICT COURT ERRED IN DECLINING TO INSTRUCT THE JURY ON THE DEFENSE OF ENTRAPMENT.

In his opening statement, O'Donovan's counsel told the jury that it would hear evidence that Buckley's words were scripted by the FBI to entice O'Donovan to cross the line from politics to crime, App:70, and devoted much of his cross-examination of Buckley to elucidating for the jury the ways that the FBI, through Buckley, had manipulated O'Donovan. Counsel was, however, precluded from pursuing this contention in arguing the defense case to the jury by the court's denial of his request

35

for an entrapment instruction and its prohibition on arguing entrapment to the jury. Doc. 91 at 20-21; App:513-14. The court did not explain its ruling other than to say that it was "not giving an entrapment defense the way this case has been presented." App:514.[9] Instead of instructing the jury regarding entrapment, the court told the jury that the government's conduct had been entirely appropriate:

> If the government is legitimately investigating suspected problems of any sort, it is within the law, it is appropriate for the government to mount an undercover operation, to have people play a role that is in fact not the truth. That is appropriate in furthering law enforcement.

App:558-59. The court emphasized that it "want[ed] to be clear" that the lies Buckley told didn't "cancel[] anything out." App:558. At the close of the instructions, counsel again objected to the lack of an entrapment instruction. App:576. The objection having been properly preserved, this Court's review is plenary. *United States v. Perez-Rodriguez*, 13 F.4th 1, 16 (1st Cir. 2021).

Given these instructions, an entrapment instruction was particularly critical. Not only did the evidence warrant it, but an entrapment instruction would have provided an essential modification of the court's instructions, which told the jury,

---

[9] If the court's reference to "the way this case has been presented" was a response to counsel's having told the court that entrapment was not O'Donovan's primary defense, App:513, such a basis for declining to instruct on entrapment was erroneous. Contesting an element of the offense—here, criminal intent—does not preclude an entrapment instruction where, as here, the defendant has met his burden of production. *Mathews v. United States*, 485 U.S. 58, 62 (1988).

without limitation, that it was entirely appropriate for the government to lie to those it was investigating and that the government's conduct had no bearing whatsoever on the question of O'Donovan's guilt or innocence. Instead, the jury should have been told that it should convict O'Donovan only if the government proved beyond a reasonable doubt that it had not induced the commission of the crimes charged through the lies Buckley told O'Donovan.

The evidence clearly showed an escalating pattern of FBI-scripted lies told to O'Donovan by Buckley calculated to drive O'Donovan to cross the line from legitimate advocacy for his client to what the jury concluded was *quid-pro-quo* bribery. Because O'Donovan met his burden to show his entitlement to an entrapment instruction, the court erred in refusing to instruct the jury regarding entrapment, and his convictions should, therefore, be vacated and the matter remanded for a new trial.

### A.    The Elements of the Entrapment Defense.

#### 1.    The defendant's modest burden.

The entrapment defense "has two prongs: (1) improper government inducement and (2) the defendant's lack of predisposition to commit the offense charged." *Perez-Rodriguez*, 13 F.4th at 17. The defendant has a "modest burden of production on the two prongs of the defense." *United States v. Rodriguez*, 858 F.2d 809, 814 (1st Cir. 1988). That burden is satisfied if the record "contain[s] evidence that makes the

37

entrapment theory 'plausible' or 'superficially reasonable.'" *Perez-Rodriguez*, 13 F.4th at 19, *quoting United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998). This Court has "emphasized [that] this is not a very high standard to meet." *Id.* "[A] judge should not hesitate to send the question to the jury if there is even ambiguous evidence of entrapment." *Id.*

In assessing whether the defendant has met his burden, "*the court must construe the evidence in the light most favorable to the defendant.*" *Id.* (emphasis added). The court may not "weigh the evidence, make credibility determinations, or resolve conflicts in the proof," *Gamache*, 156 F.3d at 9, and where there are competing inferences, "the court must draw all reasonable inferences in favor of the defendant's entrapment theory." *Perez-Rodriguez*, 13 F.4th at 19. *See Gamache*, 156 F.3d at 10 (whether the government disputes the defendant's version of the facts is "irrelevant to the question of whether it raises an issue of entrapment to be put before the jury"); *Rodriguez*, 858 F.2d at 815 (It suffices that the defendant's "version, whether or not it strikes us as particularly credible, is neither thoroughly implausible nor constructed entirely of gauzy generalities."). Once the defendant has met his burden and entrapment is in the case, "the government is obligated to prove beyond a reasonable doubt that no entrapment occurred." *Rodriguez*, 858 F.2d at 814-15.

### 2. Inducement.

While creating an opportunity to commit a crime through a sting operation does not, standing alone, constitute improper inducement, *Jacobson v. United States*, 503 U.S. 540, 550 (1992), "proof of opportunity plus 'something else' may be adequate to meet a defendant's burden." *United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996). That "plus something else" is "typically excessive pressure on the defendant *or the government's taking advantage of an alternative, non-criminal type of motive.*" *Perez-Rodriguez*, 13 F.4th at 17 (emphasis added). "Inducement may include persuasion, *false statements*, or other governmental conduct that creates a risk of causing an otherwise unwilling person to commit the crime charged." *Gamache*, 156 F.3d at 9 (emphasis added). "Even very subtle governmental pressure, if skillfully applied, can amount to inducement." *Id.*

### 3. Predisposition.

The critical question in the predisposition inquiry is whether the "defendant was disposed to commit the criminal act *prior to first being approached by Government agents.*" *Perez-Rodriguez*, 13 F.4th at 17-18, *quoting Jacobson*, 503 U.S. at 549 (emphasis added). Thus, the predisposition inquiry must focus on the time period "in advance of the government's intervention." *Id.* at 18. *See Gamache*, 156 F.3d at 12 ("[T]he concept of predisposition has a definite temporal reference: the

inquiry must focus on a defendant's predisposition before contact with government officers or agents."). This Court has identified five factors that may be relevant to the predisposition inquiry:

> (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement or persuasion offered by the Government.

*Gamache*, 156 F.3d at 9-10. The second, fourth, and fifth factors are also relevant to the inducement analysis, and the "the same factual evidence will often be relevant to both prongs." *Perez-Rodriguez*, 13 F.4th at 18.

## B. The Record Evidence Warranted an Entrapment Instruction.

### 1. Inducement.

O'Donovan could properly be convicted of the offenses charged only if his conduct crossed the line into *quid-pro-quo* bribery. Absent a *quid-pro-quo* agreement, it is not a crime to pay a lobbyist or other potentially influential person to advocate one's position to public officials, even if that person is related to the public official, *see Percoco v. United States*, 598 U.S. 319, 331 (2023), or even if, as with all lobbying, it is intended to influence a public official, *see, e.g., United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991), or even if the payment is offered in cash

and contingent upon success. The evidence here showed a progression of escalating governmental manipulation, through lies scripted by the FBI, that transformed O'Donovan's approach to an old acquaintance seeking no more than that Theory's application for a marijuana license be given careful and fair consideration into circumstances that caused O'Donovan to fear that, if he did not do what Buckley and (as he was led to believe) the Chief wanted, Theory could be unfairly penalized. It was thus that the government induced O'Donovan to cross the line from permissible lobbying to committing a crime (assuming *arguendo* that he did so).

During their initial meeting in February 2021, when O'Donovan asked Buckley to talk to the Chief, O'Donovan said that all he wanted was to ensure that Theory's application received careful consideration, as there would be numerous applications, and Theory's application was 600+ pages long. App:100, 201, 333. O'Donovan expressly told Buckley to tell the Chief that he was not looking for any favors. App:180. There was no discussion of any money going to the Chief or of the Chief's even knowing that his brother was being paid. The inference that there was nothing criminal in this interaction is a reasonable one and, must, therefore, be drawn in O'Donovan's favor.[10]

─────────────────────

[10] That this meeting took place in a church parking lot does not indicate a criminal mindset on O'Donovan's part. The location was one known to both men, App:175, and the meeting took place at the height of the Covid pandemic.

When Buckley called the Chief to tell him of his conversation with O'Donovan, the Chief terminated the conversation before Buckley could tell him that all O'Donovan was asking was that he read Theory's application and judge it on its merits and that he was not looking for favors. App:193-94. After the Chief contacted the FBI, critical portions of what Buckley told O'Donovan were scripted by the FBI. The evidence clearly showed that it was Buckley, acting as a government agent, who first introduced a *quid pro quo* element into the conversations, and it was Buckley who demanded up-front payment, telling O'Donovan that he was doing so at the Chief's insistence.

A few days after their initial conversation, O'Donovan texted Buckley, telling him to leave the matter alone because he did not want "any backfire." App:106-07. Buckley went to their next meeting on February 22, 2021, armed with "general guidelines" provided by the FBI as to what he should say. App:112-13. O'Donovan told Buckley that he just wanted to "bend [Buckley's] ear about this a little bit more." App:649. After explaining the CAC's scoring process, O'Donovan told Buckley that

---

O'Donovan told Buckley at this first meeting that he was concerned about contracting Covid and passing it to his elderly mother or his medically-compromised in-laws. App:177-78. The amount of money mentioned ($25,000), while somewhat large in the abstract, was but a minuscule fraction of the profits Theory would make if awarded one of the licenses, and O'Donovan was anticipating that the money would be paid by Theory and not by himself personally.

he was just "try[ing] to get the edge 'cause I know everyone's trying to get it," App:650, which Buckley understood to mean that, because O'Donovan was concerned that the decision would be made based on local influence, he was "just trying to help his clients to get to the front of the line to be looked at and considered for one of the licenses." App:116-17, 201-02. O'Donovan again stressed what a good company Theory was and how compelling its application would be. App:650. While O'Donovan told Buckley that he wanted the Chief to give Theory "a really good shake," he immediately expressed doubt about whether Buckley should approach the Chief at all, as he neither wanted to put the Chief "in a bad spot" nor risk hurting his client. In response, Buckley twice said that he thought he should talk to the Chief and then said that he would do so, with O'Donovan continuing to intersperse his doubts. App:651-52.Thus, we see Buckley seeking to convince O'Donovan to agree to Buckley's approaching the Chief and to override his doubts as to whether to proceed. Buckley also asked that O'Donovan "sweeten the deal." App:652. O'Donovan then said that he could guarantee $25,000 and perhaps even $50,000, but only in the event that Theory was successful. *Id.* At the end of the meeting, O'Donovan was still expressing his doubts, telling Buckley that he did not want to jeopardize Theory's chances or anger the Chief. App:654, 115-16. There was nothing said at this meeting that suggested that O'Donovan contemplated seeking a *quid-pro-quo* agreement with

the Chief. Indeed, Buckley conceded that O'Donovan had not asked anything more at this second meeting than that the Chief vote on Theory's application based on his own independent assessment. App:206.

The next communications were instigated by Buckley, at the direction of the FBI, which instructed him to falsely tell O'Donovan at their April 26, 2021, meeting that he had talked to the Chief. App:124, 206-07. Buckley's telling O'Donovan, on the instruction of the FBI, that the Chief was not a fan of marijuana and hated being on the CAC, App:202, 208, was calculated to cause O'Donovan to fear that the Chief, because of his distaste for the process and his myriad other responsibilities, would not read the applications carefully. App:202, 209-10, 213-14. O'Donovan expressed his fear that the mayor—whose ultimate decision it was—would just choose the candidates she liked and then "paint the picture" that the best candidates had won. App:659. It could help counter this, O'Donovan said, if the Chief, based on his assessment, ranked Theory highly, because the mayor would give credence to his recommendation. App:660. O'Donovan again stressed that he did not want to anger the Chief or hurt his client and that all he was asking was that the Chief give Theory a "fair shake" and its application "a good look," which is all O'Donovan thought it would take for the Chief to rank Theory highly. App:662-63. In fact, O'Donovan told Buckley to tell the Chief that if he did not like Theory's application, he should not

44

vote in its favor, App:213-14, 662-64, hardly the words of a man intent on bribing the Chief in exchange for his vote. There was still, more than two months after the initial meeting, nothing indicative of an intent on O'Donovan's part to reach (or even seek) a *quid-pro-quo* agreement with the Chief. Thus, even by April 26, 2021, the date of the iMessage charged in Count One, the government's efforts to entrap O'Donovan through Buckley's manipulation of him were well underway, and O'Donovan had shown no propensity to commit *quid-pro-quo* bribery.

O'Donovan did not contact Buckley for four months, texting him on August 28, 2021, saying "[i]t's time." Buckley, at the FBI's instruction, asked O'Donovan what he wanted him to do. O'Donovan texted that he should tell the Chief that Theory was legitimately the best candidate and that the Chief should vote them number one. App:129-30. Buckley instigated the next meeting at the direction of the FBI. Ratcheting up the pressure on O'Donovan, the FBI told Buckley to tell O'Donovan that the former mayor of Medford had approached the Chief on behalf of another candidate, App:139, 219, thus preying on O'Donovan's worry that local influence would prevail over Theory's superior application. O'Donovan responded that the mayor's approaching the Chief was "against the law," as opposed to what he himself had done in approaching the Chief's brother, App:668, evidencing O'Donovan's belief that what he was doing was lawful. Buckley twice, without prompting by

O'Donovan, interjected that he intended to talk to the Chief again. App:668-69.

Buckley also, at the FBI's instruction, brought up an investigation by the Attorney

General's office of Theory's failure to pay overtime, App:145, 220, 669, giving

O'Donovan further reason to fear for his client's prospects, even though the non-

payment had been inadvertent and the matter had been successfully settled. App:313-

16, 669. Also at the FBI's instruction, Buckley falsely told O'Donovan that he was

struggling financially, that he had told the Chief that he would be getting paid, and

that the Chief wanted to "make sure that [Buckley] was good," App:222-25, 669-70,

*i.e.*, that he really would be paid. It was Buckley who said he wanted to be paid in an

untraceable manner. App:222-25, 669-70. Thus, it was the FBI, through Buckley, that

first raised the prospect of a *quid pro quo*. O'Donovan responded that he did not want

to put the Chief "in a bad spot" and that if the Chief did not think that Theory merited

a license, then he should not vote for it. App:670. They also discussed how Buckley

would be paid if Theory were successful. App:671-72.

Over the next few days, O'Donovan texted Buckley asking him to ask the Chief

to ask Theory about its security program, texted him an articles describing Theory as

one of the best cannabis dispensaries, and advised him about Theory's interview with

the CAC. App:143. On September 27, 2021, at the direction of the FBI, Buckley

texted O'Donovan, telling him that he had talked to the Chief and asking to meet on

September 29. App:144-45. Now, the FBI moved to make the offer of a *quid pro quo* explicit. At the FBI's direction, Buckley told O'Donovan that the Chief had not ranked Theory in the top three because he was bothered by the Attorney General's investigation, App:227-28, 681-82, which was a lie fabricated by the FBI because the Chief had in fact ranked Theory number one and Buckley had had no such conversation with the Chief. App:226-28. Buckley then immediately said that the Chief would change his vote if he were assured that Buckley would be paid; it was at the FBI's direction that Buckley asked for up-front cash. App:145, 682. While O'Donovan responded by saying, "Beautiful" and "Perfect" and, according to Buckley, giving him a fist-bump, App:146, 682, he had at this point been placed in an untenable position by the FBI: if he did not do as Buckley was asking, he risked angering the Chief and fatally jeopardizing Theory's prospects. It was only at this point—seven months after their initial meeting—that the discussion changed from O'Donovan's simply asking Buckley to talk to the Chief about the merits of Theory and its application and expressing his concerns that local politics might prove more persuasive than the merits of Theory's application to ensuring that Theory would be ranked highly. App:147. It was the FBI, not O'Donovan, that introduced the prospect of a *quid-pro-quo* agreement and up-front payment to Buckley to obtain the Chief's vote. O'Donovan once again demurred on the subject of payment in advance of

success, but Buckley insisted that he needed something up front to prove O'Donovan's good faith to the Chief. App:685. The remainder of the conversation was largely devoted to O'Donovan's musings about how the Chief's concerns might be allayed without O'Donovan actually advancing any money to Buckley. App:695-93. Surely if O'Donovan were intent on securing a *quid-pro-quo* agreement with the Chief, he would have readily agreed to give Buckley some money then. Instead, he was forced to temporize to figure a way out of the box into which Buckley and the FBI had put him.

In a recorded conversation shortly after this meeting, O'Donovan suggested giving Buckley a $5,000 loan that Buckley would be required to repay if Theory was not successful. He would, he said, have to give Buckley a check. Buckley told O'Donovan that he needed a few days to think about it. App:696-97. Meanwhile, at the FBI's request, undoubtedly because O'Donovan had not yet fallen into its trap and paid money to Buckley, the CAC postponed the announcement of the rankings from October 7, 2021, until October 13, 2021. App:470. On October 11, 2021, O'Donovan gave Buckley $2,000 in cash.

Based on this evidence, a reasonable jury could find that Buckley and the FBI induced the commission of what the jury determined to be *quid-pro-quo* bribery. The earlier interactions between Buckley and O'Donovan, who repeatedly expressed

concern and hesitation and repeatedly asked Buckley to ask the Chief to evaluate Theory's application on its merits and to favor it if he liked it and to reject it if he did not, can reasonably be interpreted as showing a man who was seeking to advance his client's interests while remaining on the lawful side of the line. That did not change until more than six months after their initial conversation, when Buckley, at the instigation of the FBI, began preying upon O'Donovan's fears that local influence would prevail over Theory's superior application and causing him to be concerned that Theory would not receive the consideration its application merited because of the Attorney General's investigation. It was Buckley who told O'Donovan, on the FBI's instructions, that the Chief was insisting on up-front cash as a demonstration of good faith, and Buckley who lied to O'Donovan about the Chief's low ranking of Theory and injected a *quid pro quo* into the equation. Thus, Buckley and the FBI pushed O'Donovan into an impossible situation—either agree or risk losing everything he and his client had worked so hard for.

## 2. Predisposition.

Much of the discussion in the preceding section also bears on the question of predisposition. The factors identified by this Court as relevant to the predisposition inquiry would permit a reasonable jury to conclude that O'Donovan was not predisposed to commit *quid-pro-quo* bribery. First, nothing in the record suggests that

O'Donovan was other than a law-abiding citizen before he was targeted by the FBI. Second, as shown in the preceding section, the initial suggestion of *quid-pro-quo* bribery was made by the FBI through Buckley. All that O'Donovan was contemplating until the FBI upped the ante was employing Buckley as a lobbyist to advocate for Theory. Third, O'Donovan would have profited from Theory's success in obtaining a cannabis license, but that factor is outweighed by the fourth factor, O'Donovan's hesitation even to have Buckley speak to the chief and his concern not to do anything that would put the Chief in a bad position, a reluctance that was overridden by Buckley's pressing the matter and then presenting O'Donovan with a *fait accompli* when he told him that he had spoken with the Chief. Fifth, Buckley's lies to O'Donovan, scripted by the FBI, were calculated initially to instill fear in O'Donovan that Theory would not receive the fair consideration its application merited and then fear that, if he did not pay Buckley, as he was told the Chief insisted upon, Theory would suffer the consequences.

### 3. Conclusion.

"Determining whether government conduct has crossed the line into improper inducement or whether a person was predisposed to commit an offense are delicate questions of fact for the jury to sort out." *Perez-Rodriguez*, 13 F.4th at 19. The question at this juncture is not whether O'Donovan would ultimately have prevailed

on an entrapment defense but instead whether there was "record evidence which fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it." *Rodriguez*, 858 F.2d at 814. There was, and the court erred in denying O'Donovan's request for an entrapment instruction and barring argument regarding entrapment.

## IV. THE COURT ERRED IN EXCLUDING THE TESTIMONY OF PROFFERED DEFENSE WITNESSES.

O'Donovan's intent and state of mind were the central issues in this case, yet the district court excluded critical portions of Robert Sarcia's testimony which would have provided crucial support for O'Donovan's defenses of good faith and lack of criminal intent, as well as the testimony of Edward Mastrocola that would have corroborated Sarcia's testimony. This testimony would have served to counter the government's inculpatory interpretation of O'Donovan's responding "Beautiful" and "Perfect" when told by Buckley that the Chief would change his vote if he were paid and to support the defense's contention that O'Donovan knew that Buckley was lying when he said that, as defense counsel argued to the jury. *See* App:607-08.

The excluded testimony was offered to prove that O'Donovan knew, at the time of the alleged bribery, that Theory was very likely to receive an HCA without any payment or offer of payment to Buckley and that his belief in Theory's merits was

sincere and justified. Sarcia would have testified that (1) he was with both O'Donovan and William Carr when Carr said that the mayor of Medford had told him that Theory was in the top three candidates for cannabis licensure, if not the top candidate; (2) Carr had told Sarcia the same thing at least a dozen times; (3) Carr first said this in O'Donovan's presence in July 2021, when the men were dining at a Somerville restaurant; and (4) that during the following weeks, Carr made the same statements to O'Donovan at Sarcia's office and elsewhere. App:643-44. The evidence showed that O'Donovan knew that Carr had a close relationship with the mayor of Medford, *see* App:301, 490, thus establishing a basis for O'Donovan to place credence in what Carr told him. Mastracola would have testified that Carr told him in August 2021 that, according to the mayor or her office, Theory was one of the top three candidates, if not the top candidate. App:644.

Sarcia was permitted to testify to some of this information, but the court precluded him from testifying about the substance of the conversations about the mayor's favorable opinion of Theory as a candidate for licensure, deeming that testimony irrelevant. App:488-94. The court excluded Mastracola's testimony on the same basis. App:495. This Court reviews a trial court's decision to exclude evidence for abuse of discretion. *E.g., United States v. Pires*, 642 F.3d 1, 10 (1st Cir. 2011).

Sarcia's testimony was relevant and admissible as evidence of O'Donovan's

state of mind and lack of motive to engage in bribery. Mastracola's testimony was relevant and admissible as corroboration of Sarcia's testimony. *See, e.g., United States v. Rosario-Diaz*, 202 F.3d 54, 65 (1st Cir. 2000). This evidence would have shown that, no later than July 2021, O'Donovan had solid reason to believe that Theory was very likely to be awarded an HCA, having been told by someone close to the mayor that the mayor—in whose sole discretion the decision lay—regarded Theory was one of the top three candidates and perhaps the top candidate. Such knowledge would have had substantial impact on O'Donovan's state of mind. As previously discussed, unless O'Donovan believed Buckley that the Chief agreed to change his vote in exchange for payment to Buckley, the jury could not convict O'Donovan of honest services fraud.

The court's exclusion of Sarcia's testimony on this point deprived O'Donovan of important—and very relevant—evidence in support of his defense of lack of intent to commit *quid-pro-quo* bribery. Throughout, O'Donovan contended that all he was seeking from the Chief was a fair shake—that he read Theory's application carefully and rate it on its merits. According to the government, Buckley's lies prompted O'Donovan to finally pay Buckley some money, believing that Theory's success depended on it. The excluded evidence, coupled with O'Donovan's oft-repeated statements of his belief in the Chief's incorruptibility, would have done much to

support the defense's counter-argument: that O'Donovan would not have believed that the Chief had agreed to change his vote in return for payment to his brother and had given Buckley $2,000 only to keep the peace. App:607-21. A jury allowed to hear this evidence may well have reached a different result.

Sarcia's testimony was not excludable as hearsay, as the hearsay rule excludes only out-of-court statements offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). An out-of-court statement is admissible so long as its significance "lies solely in the fact that it was made" and "no issue is raised as to the truth of anything asserted." Fed. R. Evid. 801, advisory committee notes; *see also Franchina v. City of Providence*, 881 F.3d 32, 50 (1st Cir. 2018)("Out-of-court statements are considered 'nonhearsay' when they are offered not for the truth of the matter but for some other purpose."). Importantly, "ambiguous and doubtful cases" are to be "resolved . . . in favor of admissibility." Fed. R. Evid. 801, advisory committee notes.

This Court has repeatedly reaffirmed that "the hearsay rule does not apply to statements that are offered to show what effect they produced on the actions of a listener." *United States v. Meserve*, 271 F.3d 314, 320 (1st Cir. 2001); *see also United States v. Legarda*, 17 F.3d 496, 498-99 (1st Cir. 1994)(finding that district court erred in not permitting the defendant to "recount statements that were allegedly made to him" to show "an effect on defendant's behavior"). Relatedly, an out-of-court

statement made to a defendant may be admissible as "circumstantial evidence of [his] state of mind at the time." *United States v. DeSimone*, 488 F.3d 561, 568 (1st Cir. 2007); *see also United States v. Gibson*, 675 F.2d 825, 834 (6th Cir. 1982)(explaining that statement heard by the defendant "could have been received properly on the issue of [the defendant's] belief or state of mind in consequence of the utterance").

Sarcia's testimony about what Carr said in O'Donovan's presence was not offered for its truth, *i.e.*, to show that the mayor in fact regarded Theory's application as one of the best, nor was Mastracola's. Indeed, Carr could have been lying or mistaken about the mayor's view. Rather, its relevance lies solely in the fact that Carr made those statements in O'Donovan's presence. Had Carr told O'Donovan that Theory had not been ranked in the top three, the government would undoubtedly have offered his testimony to show O'Donovan's motive to commit bribery; the evidence of *lack* of motive is no less relevant. The court erred in excluding the testimony of Sarcia and Mastracola, and that error was not harmless.

## V. THE DISTRICT COURT ERRED IN DECLINING TO INSTRUCT THE JURY THAT CONVICTION UNDER 18 U.S.C. §666 REQUIRES AN INTENT TO INFLUENCE AN OFFICIAL ACT BY THE PAYEE.[11]

### A. Background.

O'Donovan requested that the court instruct the jury that to convict him of §666 bribery, it was required to find that he "intended to pay the Chief's brother in exchange for the Chief's official acts *and* that [he] believed the Chief had agreed to accept a bribe in exchange for official acts promised to the payor." Doc. 91 at 7 (emphasis in original). Those requested instructions also included a definition of "official act" based on *McDonnell v. United States*, 579 U.S. 550 (2016). *Id.* at 15-16. At the close of the instructions, O'Donovan objected to the court's failure to include an official act requirement in its §666 instructions. App:575-76.

This Court has in several cases proceeded on the assumption that §666 incorporates an official act requirement, *see, e.g., United States v. Martinez*, 994 F.3d 1, 6-7 (1st Cir. 2021); *Fernandez*, 722 F.3d at 19, but it has never actually decided the issue. *See United States v. Carrasco*, 79 F.4th 153, 161 (1st Cir. 2023). The Second, Fourth, Sixth, and Eleventh Circuits have considered the issue and have held that §666 does not incorporate an official act element. *United States v. Lindberg*, 39 F.4th

---

[11] This Court reviews a district court's failure to give a properly requested jury instruction *de novo*. *United States v. Henry*, 848 F.3d 1, 13 (1st Cir. 2017).

151, 165-69 (4th Cir. 2022); *United States v. Roberson*, 998 F.3d 1237, 1246-47 (11th Cir. 2021); *United States v. Ng Lap Seng*, 934 F.3d 110, 131-34 (2d Cir. 2019); *United States v. Porter*, 886 F.3d 562 (6th Cir. 2018). This Court should not join the ranks of these cases but should instead hold that §666 requires proof of a corrupt intent on the part of the payor to influence official acts of the payee, as defined by *McDonnell*.

### B.    The *McDonnell* "Official Acts" Definition.

In *McDonnell*, the parties agreed to define honest services fraud and the Hobbs Act, 18 U.S.C. §1951, by reference to 18 U.S.C. §201(b), which prohibits the giving of anything of value to a public official "with intent to influence any official act." The Court rejected the government' expansive view of "official act," under which "nearly anything a public official accepts—from a campaign contribution to lunch—counts as a quid; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a quo." *McDonnell*, 579 U.S. at 575. Instead, the Court adopted a more limited definition of "official act":

> To qualify as an "official act," the public official must make a decision or take an action on [a] "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

*Id.* at 574. That result was required, the Court said, not just for textual and precedential reasons, but also to avoid serious constitutional concerns. *Id.* at 574. First, "[t]he basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns;" were the government's broader interpretation adopted, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* at 575. Second, unless "official act" is "defined with sufficient definiteness that ordinary people can understand what conduct is prohibited, or in a manner that does not encourage arbitrary and discriminatory enforcement," "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." *Id.* at 576. Third, because state sovereignty "includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents," the Court "decline[d] to construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." *Id.* at 576-77. This Court should reach a similar result in the context of §666.

**C.** **Section 666 Should Be Construed to Include an Official Act Requirement.**

Section 666 criminalizes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person with the intent to influence or reward an agent of an organization or of a State, local, or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more," §666(a)(2), if that entity receives more than $10,000 a year in federal benefits. The text of §666 does not, to be sure, include the term "official act," *see Carrasco*, 79 F.4th at 161, but that is simply the beginning of the inquiry, not the end.[12]

Other statutes that do not include the term "official act" have been construed to include an official act element. For example, Hobbs Act extortion under color of official has long been construed to include an official act element, *see, e.g., Evans v. United States*, 504 U.S. 255, 268 (1992); *Correia*, 55 F.4th at 29, and this Court has included an official act element in Hobbs Act prosecutions since well before *McDonnell*. *See, e.g., United States v. Cruzado-Laureano*, 404 F.3d 470, 481 (1st Cir.

---

[12] One significant flaw in the analysis of those cases that have held that §666 does not have an official act element is their over-reliance on the absence of the words "official act" from the statute. *See Lindberg*, 39 F.4th at 166; *Roberson*, 998 F.3d at 1247; *Ng Lap Seng*, 934 F.3d at 133.

2005).[13]

The honest services fraud statute also does not include the term "official act," but after *McDonnell*, this Court has limited honest services fraud to bribery involving the exchange of things of value for official acts (or promises of official acts) as defined by *McDonnell*. *See, e.g., United States v. Falcon-Nieves*, 79 F.4th 116, 127 (1st Cir. 2023);*Woodward v. United States*, 905 F.3d 40, 44-46 (1st Cir. 2018).[14]

While Congress certainly has the power to define the "quo" differently in different bribery contexts, *see Ng Lap Seng*, 934 F.3d at 131-32, what the cases holding that §666 does not have an "official act" element fail to satisfactorily answer is why Congress in enacting §666 would choose a "quo" that would subject state and local officials to prosecution for a broader range of conduct that it did federal officials in §201(b) or why §666 should be construed on the assumption that it did so. After all, "Congress' interest in federal officials taking bribes is higher than its interest in

---

[13] In the wake of *McDonnell*, courts have applied the *McDonnell* definition of "official act" in Hobbs Act prosecutions. *See, e.g.,United States v. Mayweather*, 991 F.3d 1163, 1184 (11th Cir. 2021); *United States v. Chastain*, 979 F.3d 586, 592 (8th Cir. 2020); *Dimora v. United States*, 973 F.3d 496, 503 (6th Cir. 2020); *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017); *United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017).

[14] Other circuits have done so as well. *See, e.g., United States v. Lee*, 919 F.3d 340, 355-57 (6th Cir. 2019); *United States v. Fattah*, 914 F.3d 112, 152-54 (3d Cir. 2019);*United States v. Boyland*, 862 F.3d 279, 290 (2d Cir. 2017).

local officials (with some connection to federal funds) doing the same." *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022).

The history of §666 suggests that Congress intended §666 bribery to be coterminous with that under §201. Section 666 was enacted in response to a circuit split regarding whether persons not employed by the federal government could be considered "public officials" under §201. *Fernandez*, 722 F.3d at 20-21; *see Salinas v. United States*, 522 U.S. 52, 58 (1997)(Section 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds."). Its purpose was to "augment the ability of the United States to vindicate significant acts of . . . bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program," and "was to be interpreted 'consistent with the purpose . . . to protect the integrity of the vast sums of money distributed through Federal programs from . . . undue influence by bribery.'" *Id.* at 21, quoting S.Rep. No. 98-225 at 369, 370. *See Sabri v. United States*, 541 U.S. 600, 608 (2004)("Congress was within its prerogative to protect spending objects from the menace of local administrators on the take.").

Notably, in 1986, Congress amended §666 in two ways that brought its language "much closer to that found in . . . §201(b)" by adding the word "corruptly"

and substituting "intent to influence" and "inten[t] to be influenced" for the "for or because of" language of the original enactment. *Id.* at 22. Thus, Congress' intent was to extend federal bribery prohibitions to additional categories of people, but there is nothing to suggest that Congress intended to change the very definition of bribery. And there is good reason why Congress may have chosen not to expressly incorporate §201's "official act" language into §666 but instead followed the format of the bank bribery statute, 18 U.S.C. §215, *see Abdelaziz*, 68 F.4th at 23: §666 applies to private individuals who are agents of organizations receiving federal funds, not just to government employees, and referring to "official acts" would have engendered needless confusion in the context of private actors.

The text of §666 should not be read to evince a congressional intent to reach everything that a government agent does in connection with the business of the entity by which he is employed. Neither the goal of protecting the federal fisc nor the "expansive" language of §666, *Salinas*, 522 U.S. at 56-57, prevented this Court from excluding gratuities from the reach of §666. *Fernandez*, 722 F.3d at 26.[15] Thus, this Court already takes a narrower view of §666 than have other circuits that have decided this issue. The Second, Sixth, and Eleventh Circuits hold that §666

_____

[15] The Supreme Court has granted certiorari on the question whether §666 is limited to *quid-pro-quo* bribery. *Snyder v. United States*, No. 23-108, 2023 WL 8605740 (U.S. December 13, 2023). The case is set for argument on April 15, 2024.

encompasses gratuities, *see, e.g., United States v. Skelos*, 988 F.3d 645, 660 (2d Cir. 2021); *Porter*, 886 F.3d at 565-66; (6th Cir. 2018); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010), while this Circuit (as well as the Fifth Circuit in *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022)) has held that it does not.[16] In addition, this Court has held that a *quid pro quo* is required for conviction of §666 bribery, *see, e.g., Fernandez*, 722 F.3d at 19-20; the Sixth and Eleventh Circuits have held to the contrary, *see, e.g., United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009); *McNair*, 605 F.3d at 1188, and the Second Circuit has recently appeared to question whether such a requirement exists. *See United States v. Benjamin*, 94 F.4th 60, 63 (2d Cir. 2024)(assuming without deciding that §666 requires a *quid pro quo*). In addition, the Supreme Court, despite the "expansive, unqualified" language of §666, *Salinas*, 522 U.S. at 56-57, has also construed the language of §666 to limit its reach, rejecting the more expansive definition of "benefit" proposed by the government because it "would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance." *Fischer v. United States*, 529 U.S. 667, 681 (2000).

The fundamental flaw in the analysis of *Lindberg* and *Ng Lap Seng* (the only

---

[16] The Fourth Circuit has expressed skepticism regarding whether §666 extends to gratuities, *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998), but it has not actually decided the issue. *See Lindberg,* 39 F.4th at 172 n.17.

two cases to have engaged in extended analysis of the issue) is that they proceed from the assumption that the language of §666 encompasses an intent to influence anything agents might do in connection with the business of their principal without asking essential precursor question of just what it is that the official must be "influenced" to do (or what conduct the payor is seeking to influence). Section 666 was enacted to proscribe *significant acts* of bribery by state and local officials and to protect federal funds from *undue* influence by bribery. The government's interest in protecting the integrity of federal funds is only implicated where the "influence"—a *quid pro quo* offer or exchange of something of value for an official act—threatens to corrupt the decision-making process. Conduct falling outside *McDonnell*'s definition of "official act"—such as "hosting an event, meeting with other officials, speaking with interested parties," *McDonnell*, 579 U.S. at 571, or discussing the matter with others in ways that do not pressure or advise the other party to act in a certain way on the matter, is routine, everyday fare for public officials. *See McDonnell*, 579 U.S. at 575 ("[C]onscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time."). Such routine interactions between officials and constituents do not jeopardize the federal fisc.

That being the case, embracing an all-encompassing interpretation of the type of conduct by state and local officials criminalized by §666 raises the same significant

constitutional concerns which supported the Supreme Court's rejection of the government's expansive definition of "official act." "The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns." *McDonnell*, 579 U.S. at 575 (emphasis in original). A broad interpretation of the reach of §666 might cause officials to "wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* Relatedly, unless §666 is cabined to conduct that affects the federal interests that led to its enactment, "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." *Id.* at 576.

A broad construction also raises significant federalism concerns. State sovereignty "includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *Id.* at 576. It is no answer to say that in enacting §666, Congress "expressly recalibrat[ed] the federalism balance," *Ng Lap Seng*, 934 F.3d at 137, intending to "alter[] the existing balance of federal and state powers." *Lindberg*, 39 F.4th at 170, *quoting Salinas*, 522 U.S. at 59. Such a response simply begs the question: by how much did Congress intend to shift the balance? "[W]hen § 666 is used to 'prosecute purely local acts of corruption,' it is arguably

unconstitutional because it is not necessary and proper to carry into execution [Congress's] spending power." *Hamilton*, 46 F.4th at 398, *quoting United States v. Lipscomb*, 299 F.3d 303, 364-77 (5th Cir. 2002)(opinion of Smith, J.). This Court should decline to "construe [§666] in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." *Id.* at 577.

Nothing else in the language of §666 provides the necessary limitations on the official conduct reached by the statute. The limitations of the reach of §666 to agents of entities receiving more than $10,000 in a given year and to things of value given in connection with business or transactions of the entity valued at $5,000 or more provide minimal limitation at best, given the vast amounts of money the federal government provides to state and local governments, how few, if any of those benefit grants would be less than $10,000, and how little of the business or transactions of state and local governments are likely to be valued at less than $5,000. And those dollar amounts provide no limitation whatsoever on the types of conduct that must be sought to be influenced under §666. That the influence must be "in connection with any business, transaction, or series of transactions" of the entity receiving the federal funds also provides no limitation in this context. "Any business" has been broadly defined, *see Salinas*, 522 U.S. at 57, and "in connection with" could

encompass any interaction a citizen had with an official that related in any way to matters falling within the entity's remit.[17]

Section 666's "corruptly" element may in some contexts "provide[] a meaningful limit on the provision's sweep," *Abdelaziz*, 68 F.4th at 25, but it does not do so here. "Corruptly" defines the requisite *mens rea* and provides a meaningful dividing line between bribes and gratuities, but it provides no limitation on just what it is that must be influenced (or sought to be influenced) to bring §666 to bear upon the conduct at issue.

In sum, §666 should be construed to include an official acts element, and the district court erred in declining to so instruct the jury.

### D.    The Error Was Not Harmless.

The impact of the erroneous omission of an official act element from the instructions regarding Count Three cannot be viewed apart from the manner in which the court *did* instruct the jury. After telling the jury that O'Donovan must have "acted corruptly with the intent to influence or reward an agent of the City of Medford with

_____

[17] *Lindberg*, in rejecting a similar argument, reasoned that "whatever the outer bounds of 'business," the term does not include the conduct the *McDonnell* court was primarily concerned with: a typical meeting, call or event (without more)." 39 F.4th at 175. That reasoning ignores the broad "in connection with" language of §666. Why would meetings, calls, and events relating to matters pending before the entity not be "in connection with" "any business" of the entity?

respect to a transaction or series of transactions of the City of Medford," App:571, the court instructed the jury that "corruptly" meant that, to convict O'Donovan of violating §666, it was required to find that he "ha[d] the specific intent that by his interaction with Michael Buckley, the payment or payments to Michael Buckley, . . . *he believed that he had a deal then that the Chief would in some way . . . give an edge to Wellness*, but would out of care for his brother, . . . not exercise his judgment, as required by law, fairly and impartially." *Id.* (emphasis added). "An edge" is, however, precisely what everyone competing for government business seeks, whether through personal interaction or through the offices of third parties such as lobbyists or other potentially influential people. It is also what the defense argued was O'Donovan's intent.

At their initial meeting, all O'Donovan told Buckley he wanted was to ensure that his client's application was read carefully and fairly considered. App:100. At their second meeting, O'Donovan told Buckley that he was "trying to get the edge," which Buckley understood to mean that O'Donovan was "just trying to help his clients to get to the front of the line to be looked at and considered for one of the licenses." App:116-17. O'Donovan did not ask anything at this second meeting other than that the Chief vote on Theory's application based on his own independent assessment. App:206, 247. He further told Buckley that he would not ask the Chief

68

to do anything if the Chief did not regard the application favorably. App:214.

O'Donovan told Buckley several times that all he wanted was "a fair shake," App:124-25, 178-79, and repeatedly told him that Theory was a great company and that he hoped the Chief would read its application carefully. App:169-70. O'Donovan also told Buckley that he wanted no favors from the Chief; he just wanted the Chief to read the application and judge it on its merits. App:193-94, 242.

While, in convicting O'Donovan on the honest services fraud counts, the jury apparently did find an intent to influence an official act, the verdicts on those counts are not a reliable guide to what the jury did or did not find, given the multiple errors in the court's instructions to the jury, see Section VI, *infra*, and the insufficiency of the evidence on Count One. *See* Section II, *supra.* Moreover, the court instructed the jury that "a decision or action on a qualifying step, did you qualify for a host agreement, would be an official act." App:583. That instruction was broad enough to encompass the reading and consideration of Theory's application—an "action" on a "qualifying step." Thus, under the court's instructions, the jury could have convicted O'Donovan based on no more than his efforts to secure the Chief's careful consideration of Theory's application, *i.e.*, his attempt to secure "an edge" for his client.

## VI.   THE COURT'S INSTRUCTIONS TO THE JURY WERE ERRONEOUS.

Prior to trial the court told the parties that it intended to charge "at a very high level" of generality that would not require it to resolve instruction issues on which the parties disagreed. App:48. That high level of generality produced instructions that were incomplete, confusing, and, in several respects, erroneous.[18]

> **A.   The Court's Instructions Regarding Honest Services Fraud Erroneously Suggested to the Jury That it Could Find the Fraud Element of Honest Services Fraud Satisfied If it Found That O'Donovan Made Material Misrepresentations.**

The court's primary instructions, to which O'Donovan objected, told the jury that "the fraud part of the scheme" consisted of making material misstatements of fact to further the scheme. App:567. The jury was obviously left perplexed about the elements of honest services fraud and asked the court if there were "a long version of charging honest services fraud," a question the court declined to address. App:578. During its deliberations, the jury again asked for further instructions regarding honest services fraud. App:634. In response, the court told the jury that it had already "described the elements of the scheme, at least as charged, which the government has

---

[18] The issues having been preserved, this Court "consider[s] de novo whether an instruction embodied an error of law, but . . . review[s] for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." *United States v. Wright*, 937 F.3d 8, 22 (1st Cir. 2019).

to prove, and I'm not going to repeat them." App:635.[19] The court then told the jury that, to convict O'Donovan, it had to find that he had "knowingly devised a scheme . . . to accomplish honest services bribery—*honest services, excuse me, wire fraud.*" App:635(emphasis added). It further told the jury: "[T]he part of the scheme that deals with defrauding requires that Mr. O'Donovan make statements or make a misrepresentation of material fact—material means something that would make a difference to the person hearing it, a misstatement of material fact knowing that what he was saying was untrue, with the object, with the goal of making the scheme come about." App:636. The court did not further explain the requisites of *quid-pro-quo* bribery. The defense objected to the court's employment of classic wire fraud misstatement language and its failure to elucidate further for the jury the requisites for a finding of *quid-pro-quo* bribery. App:638.

The supplemental instructions can only have confused the jury further. Absent tying the misstatements to furthering a bribery scheme and redefining bribery for the jury, the jury was left with the unmistakable impression that the gravamen of the honest services fraud offense was the material misstatement. That mistaken impression quickly and erroneously opened an avenue for conviction based on

---

[19] The jury had not been provided with a written copy of the instructions. App:635.

O'Donovan's misstatements to both Pollock and Buckley, conduct falling well outside the bribery and kickback core of honest services fraud. *See* Section II(A), *supra*.

The deficiencies in the supplemental instructions were particularly prejudicial in light of the government's stress in its final arguments on O'Donovan's deception of Pollock. App:586, 593, 587-98, 601-02, 603-04. That the jury likely convicted O'Donovan on this basis is reflected in the speed with which it reached its verdicts after returning to its deliberations following these supplemental instructions. Those instructions provided no additional guidance regarding how the jury was to determine whether O'Donovan had the specific intent to commit bribery, yet the jury returned its verdict in only fourteen minutes after receiving the supplemental instructions. App:638.

## B. The Instructions Failed to Convey the Requirement of a *Quid-Pro-Quo* Agreement.

The *sine qua non* of bribery, under both §1346 and §666 is the *quid-pro-quo* agreement. *See, e.g., Fernandez*, 722 F.3d at 19; *McDonough*, 727 F.3d at152; Section II(A), *supra*. During the charge conference, the court told the parties that it intended to charge that "the government has to prove that Mr. O'Donovan, beyond a reasonable doubt, believed that in pursuit of that scheme he had formed an

agreement . . . to effect that scheme." App:500. *See also* App:501 (O'Donovan "has to believe he has an agreement"); *id.* (O'Donovan "has to believe he has effected an agreement through Michael Buckley by paying Michael Buckley, the he believes he has a deal where the chief, Jack Buckley, will conduct himself . . . otherwise than he in honest services is required to do"); App:502 (must have the "actual belief in the mind of [O'Donovan] that he's effectuated a deal through this conduct"). These statements by the court correctly reflected the language of the indictment, which charged that O'Donovan believed that he in fact had reached an agreement in which he would pay Buckley in exchange for the Chief's favorable vote on Theory's application. App:28-29, 30-31.

In the actual instructions, however, while the court correctly told the jury that honest services fraud required "a quid pro quo . . . [a] specific intent to give something of value in exchange for an official act," App:564, its subsequent instructions erroneously diluted the *quid-pro-quo* element by telling the jury that it sufficed if the government only proved that O'Donovan believed that he might be able to reach an agreement with the Chief if he made the payment to Buckley. The instructions told the jury:

- that the government had charged that O'Donovan devised a scheme "in which he was going to pay . . . Buckley . . . a sum of money *with the idea* that the Chief, knowing about it, would in some way not exercise

73

his honest services in the evaluation of candidates to be recommended to the Mayor for these marijuana licenses . . . ." App:565 (emphasis added);

- the government claims that O'Donovan "by his interactions with . . . Buckley, known to [the Chief] *would cause* . . . the Chief . . . to act in a way that was not giving his honest services to the city of Medford," App:566 (emphasis added);

- that O'Donovan's "specific intent has got to be *that he comes to believe* that if he makes these payments, or promises to pay . . . that fact is going to get to the Chief, and from the fact that he's agreed to pay . . . Buckley, that is corruptly going to affect the Chief's vote with respect to these marijuana licenses," App:566 (emphasis added);

- the government must prove that it was the specific intent of . . . O'Donovan to offer that money believing *that he could get a deal* with the Chief . . . ." App:566-67 (emphasis added);

- [T]he government has to prove that there's a specific intent on Mr. O'Donovan's part to give something of value to . . . Buckley *with the idea that he could create or have created a deal* whereby [the] Chief . . . because of the payments to [Buckley] would act differently than his honest services required," App:579 (emphasis added).

The defense objected to the instructions for failing to require that the jury find that O'Donovan believed that he in fact had reached a deal with the Chief. App:574. Because the essential *quid-pro-quo* element required that the jury find that O'Donovan believed that he *had* reached an agreement with the Chief, these instructions were erroneous.

The error was not harmless. In instructing the jury as it did, the court deprived

O'Donovan of his primary defense—that he did not have a corrupt intent because he did not believe that the Chief had agreed or would agree to be bribed and that all he wanted was fair consideration of Theory's application and that it was only his hope that the Chief would advocate for Theory with the mayor. Based on these instructions, the jury could have convicted O'Donovan without actually finding *quid-pro-quo* bribery, as these instructions allowed for a conviction based on evidence that showed no more than O'Donovan's payment to Buckley with the hope that the Chief would advocate with the mayor and would give O'Donovan's client an edge in the competition. Indeed, even at their last meeting, O'Donovan was expressing his hopes to Buckley, not his expectations—his hope that "my guys score the highest" and his hope that "Jack can say to the Mayor, 'give it to them.'" App:708.

### C. The Instructions Regarding the §666 Count Erroneously Defined the "Quo" Required.

The Court told the jury that, to convict O'Donovan on Count Three, it was required to find that O'Donovan had "the specific intent that by his interaction with . . . Buckley, that he believed anyway—it doesn't have to be true, the Chief doesn't even have to know anything about it, but he believed he had a deal that the Chief *would in some way . . . give an edge to [Theory]*, but would out of care for his brother . . . would not exercise his judgment, as required by law, fairly and impartially,"

App:571 (emphasis added). O'Donovan objected to the manner in which the Court described the required "quo," contending that §666 required, at minimum, a contemplated exchange of a thing of value for an official act. App:574-75.

The "giv[ing] the edge" language of the instruction impermissibly diluted the *quid-pro-quo* requirement and fatally undermined O'Donovan's defense. It was, moreover, inconsistent with the court's instructions regarding the permissibility of lobbying. App:563-64, 578-79. After all, getting an edge is precisely what lobbyists are paid to do, and seeking to get an edge encompasses a considerably wider range of conduct than does *quid-pro-quo* bribery. The error in the instruction was particularly pernicious in light of the fact that getting an edge was precisely what O'Donovan told Buckley he was seeking to do.

## E. Cumulative Error.

Even should this Court decide that none of the errors discussed above by themselves were sufficiently prejudicial to warrant vacating O'Donovan's convictions, the Court should nonetheless vacate O'Donovan's convictions under the cumulative error doctrine, which holds that errors not individually reversible can become so cumulatively "because '[i]ndividual errors, *insufficient in themselves to necessitate a new trial*, may *in the aggregate* have a more debilitating effect' and thus add up to prejudice." *United States v. Baptiste*, 8 F.4th 30, 39 (1st Cir. 2021), *quoting*

*United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993)(emphasis added by court). In assessing a claim of cumulative error, the Court looks to "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case." *United States v. Padilla-Galarza*, 990 F.3d 60, 85 (1st Cir. 2021).

The errors here were all interrelated and dealt with the most critical portion of the instructions—the very definition of the elements of the offenses with which O'Donovan was charged. The instructions confused the jury, were internally inconsistent, and, most importantly, by erroneously defining the essential elements of the crimes charged, provided the jury with invalid bases for conviction. Far from attempting to correct the errors, the court gave short shrift to O'Donovan's objections. Given the nature of the errors, the strength of the government's case should not be a determining factor. While, with the exception of Count One, the government might have been able to convict O'Donovan before a jury properly advised of the elements of the charged offenses, verdicts that rest on erroneous definitions of the elements of the offenses such as those at issue here are not ones worthy of confidence. Moreover, O'Donovan mounted a strong defense, *see* App:606-25, which might well have prevailed under instructions properly defining the elements of the offenses.

## CONCLUSION

For the foregoing reasons, O'Donovan's convictions on Counts One and Two should be reversed and his conviction on Count Three vacated and the matter remanded for a new trial. At minimum, O'Donovan's convictions on all counts should be vacated and a new trial ordered.

Respectfully submitted,
By his attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————

No. 24-1200

————————

UNITED STATES OF AMERICA,
Appellee

v.

SEAN O'DONOVAN,

Defendant-Appellant

————————

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND
LENGTH LIMITATIONS**

————————

This brief has been prepared using:

14 point, proportionally spaced, serif typeface (such as CG Times or
Times New Roman). Specify software name and version, typeface name,
and point size below:

WordPerfect Office 2021. 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of
citations; addendum; and the certificate of service, appellant's briefs contain, in total:

18,404 words, as permitted by Court order dated March 29, 2024.

I understand that a material misrepresentation can result in the Court striking
the brief or imposing sanctions. If the Court so directs, I will provide a copy of the
word or line printout.

**/s/ Kimberly Homan**
Kimberly Homan

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 3rd day of April, 2024, the Brief of Defendant-Appellant Sean O'Donovan (amended to conform with court order) was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Kimberly Homan**
Kimberly Homan

# ADDENDUM

# TABLE OF CONTENTS

Judgment with Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

AO 245B (Rev. 02/18)     Judgment in a Criminal Case
                         Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| | ) | |
| SEAN O'DONOVAN | ) | Case Number: **1   22   cr   10141   - 001   - WGY** |
| | ) | |
| | ) | USM Number:  07628-510 |
| | ) | |
| | ) | Martin G. Weinberg |
| | ) | _____ |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    1, 2 and 3
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1343 | Honest Services Wire Fraud | 10/07/21 | 1-2 |
| 18 USC § 666(a)(2) | Bribery Concerning Programs Receiving Federal Funds | 12/31/21 | 3 |

    The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/7/2024
_____
Date of Imposition of Judgment

/s/ William G. Young
_____
Signature of Judge

The Honorable William G. Young
Judge, U.S. District Court
_____
Name and Title of Judge

2/28/2024
_____
Date

AO 245B (Rev.02/18)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   2   of   7

DEFENDANT:  SEAN O'DONOVAN
CASE NUMBER:   1  22 cr   10141   - 001 - WGY

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total
term of:   24   month(s)

on each count; each count to run concurrently with each other.

☑   The court makes the following recommendations to the Bureau of Prisons:

The defendant be designated to the Federal Prison Camp at Devens.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☑   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑   before 2 p.m. on   3/27/2024 _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____   to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT:   SEAN O'DONOVAN
CASE NUMBER:   **1  22  cr   10141   - 001 - WGY**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :                    **36**   month(s)

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that you
pose a low risk of future substance abuse. *(check if applicable)*

4.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as
directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT:   SEAN O'DONOVAN
CASE NUMBER:   1  22  cr  10141  - 001 - WGY

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B(Rev. 02/18)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page _____5_____ of _____7_____

DEFENDANT:   SEAN O'DONOVAN
CASE NUMBER:   1  22  cr   10141   - 001 - WGY

## SPECIAL CONDITIONS OF SUPERVISION

1. You must submit to substance use testing, not to exceed 104 drug tests per year, to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

2. You must pay the balance of any fine imposed according to a court-ordered repayment schedule.

3. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

4. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

5.  You must not practice law in any jurisdiction or seek to restore law license until the completion of the period of supervised release.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT: SEAN O'DONOVAN
CASE NUMBER: 1 22 cr 10141 - 001 - WGY

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ 150,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $              0.00 | $              0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

   ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page   7   of   7

DEFENDANT:   SEAN O'DONOVAN
CASE NUMBER:   **1  22  cr  10141  - 001 - WGY**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $   300.00   due immediately, balance due

        ☐   not later than        , or
        ☑   in accordance with   ☐  C,   ☐  D,   ☐  E, or   ☑  F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal        *(e.g., weekly, monthly, quarterly)* installments of $        over a period of        *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal        *(e.g., weekly, monthly, quarterly)* installments of $        over a period of        *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within        *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☑   Special instructions regarding the payment of criminal monetary penalties:

        Payment of the fine balance is to begin immediately according to the requirements of the Federal Bureau of Prisons' Inmate Financial Responsibility Program while the defendant is incarcerated and according to a court-ordered repayment schedule during the term of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS (Boston)

 3                              22-cr-10141-wgy

 4

 5

 6

 7

 8   ***********************************
                                        *
 9   United States vs. Sean O'Donovan   * JUDGE'S FINDINGS
                                        *
10   ***********************************

11

12

13

14

15        BEFORE:  Honorable Judge William G. Young

16

17

18                     Richard H. Romanow
19                    Official Court Reporter
                    United States District Court
20                       1 Courthouse Way
                    Boston, Massachusetts 02210
21
                    Wednesday, February 7, 2024
22

23

24

25
```

```
1           THE COURT:  Mr. Sean O'Donovan, in consideration
2    of the offenses of which you stand convicted, the
3    information from the United States Attorney, your
4    attorney, the probation officer, and yourself, this
5    Court sentences you, on each of the counts of
6    conviction, to 2 years -- 24 months in the custody of
7    the United States Attorney General, the sentence on each
8    count to run concurrent, one with the other.  The Court
9    places you on supervised release for a period of 3 years
10   with all the terms and conditions, general and special,
11   set forth on Pages 26 and 27 of the presentence report,
12   plus 1 additional condition imposed by this Court that
13   you not practice law or seek to practice law in any
14   jurisdiction or seek to have your law license restored
15   until the conclusion of your period of supervised
16   release.
17           The Court fines you $150,000.  The Court imposes a
18   special assessment of $300 -- excuse me, $100 on each
19   count as is required by the law.
20           Let me explain this sentence to you.  That was one
21   of the most effective allocutions I've heard, and I
22   believe it.  I would have imposed a higher sentence, but
23   for that.  You have taken responsibility for this
24   misconduct.
25           It is -- it is terribly offensive and demeaning
```

1    conduct in the operation of our government, and

2    government must be free from that corruption.  And so a

3    sentence of imprisonment, a significant sentence of

4    imprisonment and a significant fine is required here.

5    At the same time, as Mr. Weinberg eloquently argued for

6    you, that's not your whole life.

7         This is a fair and a just sentence.  The Court has

8    no hesitancy in imposing it.

9         You do have the right to appeal from any findings

10   or rulings the Court has made against you.  Should you

11   appeal and should your appeal be successful in whole or

12   in part and the case remanded, you'll be resentenced

13   before another judge.

14        Now Mr. Weinberg, if an appeal is decided upon,

15   you want transcript, seek it from this session of the

16   court.  Do you understand?

17        MR. WEINBERG:  I do, your Honor.

18        THE COURT:  Do you have any objection to self-

19   reporting?

20        MS. BARCLAY:  No, your Honor.

21        THE COURT:  He will self-report to the place of

22   confinement on Wednesday, the 20th of March, 2024.

23        MR. WEINBERG:  I'm sorry to interrupt, but can I

24   ask for an extra week?  His mother has a medical

25   procedure on the 20th.  So the 27th?

 1          THE COURT:  Yes, the 27th.  He will report on the

 2     27th.

 3          MR. WEINBERG:  And can I ask the Court for two

 4     other things.  One is for a judicial recommendation for

 5     the Federal prison camp at Devens so he can be close

 6     enough to his family?

 7          THE COURT:  The Court so recommends and the

 8     judgment will reflect that.

 9          MR. WEINBERG:  And lastly, should he want to

10     appeal, would the Court consider bail pending appeal,

11     please?

12          THE COURT:  Well, if -- I consider what's in front

13     of me, I don't give advisory opinions.

14          MR. WEINBERG:  Thank you, Judge.  If he decides to

15     appeal, we'll file a motion.

16          And, thank you very much, Judge.

17          THE COURT:  That's the sentence.  We'll recess.

18          (Ends, 2:45 p.m.)

19

20

21

22

23

24

25