# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

No. 24-1200
_____


UNITED STATES,
Appellee

v.

SEAN O'DONOVAN,
Defendant-Appellant


_____

On Appeal from a Judgment of Conviction in the United States District Court
for the District of Massachusetts
_____

REPLY BRIEF OF DEFENDANT-APPELLANT SEAN O'DONOVAN
_____

KIMBERLY HOMAN
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

MARTIN G. WEINBERG
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

I.   THE INTERSTATE COMMERCE ELEMENT . . . . . . . . . . . . . . . .   3

    A.   The Evidence Was Insufficient to Prove that the
         iMessages Were Transmitted In Interstate Commerce . . . . . .   3

    B.   Davis' Testimony Should Have Been Stricken . . . . . . . . . . . .   6

         1.   Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

         2.   Rule 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

II.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
     O'DONOVAN'S CONVICTION ON COUNT ONE . . . . . . . . . . . .   9

    A.   The Evidence Did Not Suffice to Prove the Existence
         of a Scheme to Commit *Quid-Pro-Quo* Bribery as of
         April 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

    B.   Even if Such a Scheme Existed, the April 26 iMessage
         Was Not Part of its Execution . . . . . . . . . . . . . . . . . . . . . . . .   13

III.   THE DISTRICT COURT ERRED IN DECLINING TO
      INSTRUCT THE JURY ON THE DEFENSE OF ENTRAPMENT.   14

    A.   Judicial Estoppel is Inapplicable . . . . . . . . . . . . . . . . . . . . . .   14

    B.   There Was No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

    C.   O'Donovan Was Entitled to an Entrapment Instruction . . . . .   17

IV.   THE COURT ERRED IN EXCLUDING THE
     TESTIMONY OF PROFFERED DEFENSE WITNESSES . . . . . . .   21

V.   THE OFFICIAL ACT REQUIREMENT . . . . . . . . . . . . . . . . . . . . . .   24

VI.   THE COURT'S INSTRUCTIONS TO THE JURY
      WERE ERRONEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

      A.    The Material Misstatements Instruction . . . . . . . . . . . . . . .   25

      B.    The *Quid-Pro-Quo* Requirement . . . . . . . . . . . . . . . . . . . . .   26

      C.    The Erroneous "Quo" Instruction . . . . . . . . . . . . . . . . . . . . .   27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . .   29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

# TABLE OF AUTHORITIES

## **Cases**

*Percoco v. United States*, 598 U.S. 319 (2023) . . . . . . . . . . . . . . . . . . . . .   3

*Schmuck v. United States*, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . .   14

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) . . . . . . . . . . . . . .   25

*United States v. Brown*, 669 F.3d 10 (1st Cir. 2012) . . . . . . . . . . . . . . . .   9

*United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995) . . . . . . . . . . . .   10

*United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997) . . . . . . . . . . . . . .   4, 6

*United States v. Davila-Nieves*, 670 F.3d 1 (1st Cir.  2012) . . . . . . . . . .   16

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988) . . . . .   23

*United States v. Fernandez*, 722 F.3d 1 (1st Cir.  2013) . . . . . . . . . . . . .   27

*United States v. Gamache*, 156 F.3d 1 (1st Cir. 1998) . . . . . . . . . . . . . .   20

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) . . . . . . . . . . . . . . .   26

*United States v. Guerrero-Narvaez*, 29 F.4th 1 (1st Cir. 2022) . . . . . . . .   12

*United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) . . . . . . . . . . . . .   25

*United States v. Joost*, 92 F.3d 7 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . .   16

*United States v. Kearn*, 863 F.3d 1299 (10th Cir. 2017) . . . . . . . . . . . . .   7

*United States v. Lewis*, 554 F.3d 208 (1st Cir. 2009) . . . . . . . . . . . . . . . .   4, 5

*United States v. McClain*, 934 F.2d 822 (7th Cir.  1991) . . . . . . . . . . . . .   3

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) . . . . . . . . .   26

*United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020) . . . . . .   7

*United States v. Neal*, 36 F.3d 1190 (1st Cir. 1994) . . . . . . . . . . . . . . .   9

*United States v. Pereira*, 848 F.3d 17, 26-27 (1st Cir. 2017) . . . . . . . . .   8

*United States v. Perez-Rodriguez*, 13 F.4th 1 (1st Cir. 2021) . . . . . . . . .   20

*United States v. Phillips*, 376 F. Supp. 2d 6 (D. Mass. 2005) . . . . . . . . . .   4

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) . . . . . . . . . . . . . . . .   12

*United States v. Rodriguez*, 858 F.2d 809 (1st Cir. 1988) . . . . . . . . . . .   20

*United States v. Simon*, 12 F.4th 1, 55 (1st Cir. 2021) . . . . . . . . . . . . .   23

*United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2008) . . . . . . . . . . . . . . .   12

*United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) . . . . . . . . . . . . . .   14

*United States v. Vega*, 813 F.3d 386 (1st Cir. 2016) . . . . . . . . . . . . . . . .   9

*United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007) . . . . . . . . . . . .   12

*United States v. Wilson*, 798 F.2d 509 (1st Cir. 1986) . . . . . . . . . . . . . . .   23

## **Statutes and Rules**

18 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

18 U.S.C. § 1952(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

18 U.S.C. §2252(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 7, 8

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 7, 8

## **Other Authorities**

Transcript of Oral Argument, *Snyder v. United States*, No.23-108 . . . . .   24

## INTRODUCTION

The government's highly selective excision of snippets of recorded conversations, often taken out of context, in both its Statement of Facts and certain of its arguments omits important evidence crucial to a fair evaluation of the issues raised by O'Donovan and to an understanding of the context in which these events unfolded: O'Donovan's repeated insistence that he was not looking for favors and that all he wanted was to ensure that Theory received a fair shake and a careful review of its application, his belief that Theory was in fact the best candidate (a belief validated by Theory's top ranking), his repeated expressions of belief in the Chief's integrity and incorruptibility, his telling Buckley that if the Chief did not like Theory's application, he should not vote for it, and his expressions of his hopes and requests, rather than demands or expectations. Not surprisingly, the government also omits to mention all the myriad ways in which the FBI, through Buckley, manipulated O'Donovan. *See* Brief of Appellant ("AB") at 40-49.

The government insists that O'Donovan was guilty of bribery as early as February-April 2021, but the facts, even as stated by it, fit no recognizable bribery paradigm until (arguably) Buckley's September 29 lie that the Chief would change his vote if Buckley were paid. O'Donovan never asked that the Chief breach his duty of honest services, never offered anything to the Chief, even indirectly, and asked only that Buckley urge the Chief to consider Theory's application carefully, vote

based on his own independent judgment, and, if he regarded Theory favorably, to convey his support to the Mayor. There was nothing illegal in the enlistment of the Chief's brother to lobby him regarding Theory's merits, and such requests fall comfortably within the parameters of the legitimate lobbying function. Buckley was not simply a Harvard finance employee, Brief for the United States ("GB") at 5; he also had extensive experience with municipal government politics through his years as an administrative assistant to the Mayor of Somerville. App:87-88. There was, moreover, nothing that indicated an intention on O'Donovan's part that the Chief ever know about his offer of payment to Buckley, nor was there evidence of O'Donovan's offering anything to the Chief, of the Chief arranging or agreeing to any payment to Buckley, or of any communication until September 29 that indicated that the Chief had committed or would commit to doing anything, not even to reading Theory's application, in exchange for the payment to Buckley. Indeed, Buckley conceded on cross-examination that, through September 14, O'Donovan had not asked anything more than that the Chief read Theory's application and vote based on his independent assessment of its merits. App:180, 189, 205-06, 215, 221. Absent such evidence, there could be no *quid pro quo* and no corrupt exchange involving the Chief's honest services.

Absent a *quid-pro-quo* agreement, it is not a crime to pay a lobbyist or other

2

potentially influential person to advocate one's position to public officials, even if that person is related to the public official, *see Percoco v. United States*, 598 U.S. 319, 331 (2023), or even if, as with all lobbying, it is intended to influence a public official, *see, e.g., United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991), or even if the payment is to be in cash[1] and contingent upon success. Absent a *quid-pro-quo* agreement, evidence of which was wholly lacking here until at least September 29, when the government's entrapment efforts reached their culmination, the evidence shows nothing other than a lawful, even if potentially distasteful, lobbying effort. Here, it was not until many months after the April 26 iMessage charged in Count One that Buckley, at the instigation and with the coaching of the FBI, even told O'Donovan on September 14 that he had told the Chief that he (Buckley) would be paid and then on September 29 proposed an explicit *quid-pro-quo* agreement. Neither the recorded conversations nor Buckley's testimony provided any basis for a finding that O'Donovan was engaged in an illegal bribery scheme prior to September 29.

## I.    THE INTERSTATE COMMERCE ELEMENT.

### A.    The Evidence Was Insufficient to Prove that the iMessages Were Transmitted In Interstate Commerce.

Congress has several ways of defining how broadly it intends to exercise its

---

[1] It was Buckley who expressed to O'Donovan his desire to be paid in an untraceable manner. *See* AB:7.

Commerce Clause powers when defining the interstate commerce element of criminal statutes. They run the gamut from broadly criminalizing *use* of interstate commerce *facilities*, *see, e.g.*, 18 U.S.C. §1952(a), or "any means" of interstate commerce, *see, e.g.*, 18 U.S.C. §2252(a)(2), to the much narrower definition of §1343, which requires that the transmission be *in* interstate commerce, *i.e.*, that the transmission have actually crossed state lines. Adoption of the government's argument would transform §1343 into a use-of-interstate-facilities statute, something that Congress has twice declined to do. *See United States v. Phillips*, 376 F. Supp. 2d 6, 8 (D. Mass. 2005). If Congress believes that the government's Commerce Clause powers permit it to extend §1343 to encompass purely local frauds committed through the use of wholly intrastate transmissions, that is for it to say.

O'Donovan has already explained why *Carroll* and *Lewis* should not be controlling here, AB:19-22, and the government's contentions do not undermine those arguments. There was no impossibility of proof here, *see* GB:18, only a failure of the government to offer competent evidence regarding the location of Apple's servers. The government apparently believed such proof essential to its case, first calling a witness whose testimony was stricken for lack of personal knowledge, resting its case subject to producing further evidence of the locations of Apple's servers, then producing a document from Apple that the court ruled inadmissible,

App:536-37, and only then, as a last-ditch fallback effort, recalling Davis over objection.

O'Donovan does not "stand[] in the same shoes" as *Lewis*. GB:18. On the contrary, the government is asking this Court to go further than *Lewis* and hold that anyone who sends a text message that is related to an alleged fraudulent scheme, no matter how minutely localized that scheme is, commits a federal crime. To reduce the government's argument to its logical absurdity, a husband sitting in the living room who sends a text to his wife in the bedroom concerning a scheme to defraud a neighbor down the street could be convicted of an interstate wire fraud.

*Lewis* cannot be so completely divorced from its context as the government would have it. In *Lewis*, there was extensive expert testimony establishing that the transmission could have been bounced anywhere in the country (or even the world) before arriving at its destination, thus providing the jury with a basis for evaluating the likelihood that the transmission actually crossed state lines. Here, there was no evidence on which the jury could rationally base a finding that the iMessages crossed state lines, something that the government conceded it was required to prove. The record is devoid of reliable evidence that Apple iMessages travel through the internet in the same manner as that described in *Lewis*. *See* Section I(B), *infra.* Absent evidence from which the jury could conclude that the iMessages actually did cross

state lines, its verdict was necessarily based on nothing more than speculation.

O'Donovan's arguments are also not precluded by *Carroll*. *See* GB:17, 19. Critically, it does not appear that the issue of whether internet transmission, standing alone, would satisfy the interstate commerce element of the statute was even before the Court in *Carroll*; the defendant confined his sufficiency arguments to attacking the credibility of his niece, of whom he had taken photographs in New Hampshire. 105 F.3d at 742-43. The niece testified that the defendant intended to take the photographs to Massachusetts to be scanned into a computer located in Massachusetts and to have the photographs developed in Massachusetts. *Id.* at 742. Thus, the defendant had "reason to know"—the language of the applicable statute—that the photographs would be transported across state lines; his intent was to transport the photographs from New Hampshire to Massachusetts, which would have sufficed, even without reference to the internet, to prove the interstate commerce element. The Court's broad language regarding use of the internet was, therefore, entirely unnecessary to its resolution of the issue before it.

### B.   Davis' Testimony Should Have Been Stricken.

#### 1.   Rule 702.

The government is simply wrong in stating that Rules 701 and 702 are not applicable when a witness testifies to "facts, not opinion." GB:29. Rule 702 on its

face permits experts to "testify in the form of an opinion *or otherwise*" (emphasis added). Experts testify to facts all the time, one critical distinction being that their specialized knowledge of those facts may, unlike the case with lay witnesses, be derived from hearsay sources. The only support that the government cites for the extraordinary proposition that Rules 701 and 702 have nothing to do with fact testimony is a brief throw-away footnote in an out-of-circuit case. GB:29. In that case, *United States v. Kearn*, 863 F.3d 1299 (10th Cir. 2017), the witness simply recited facts within his own personal knowledge, which required no specialized expertise that would have brought the testimony within the scope of Rule 702.

That many people may know generally that iPhones transmit data over the internet, GB:29, does not eliminate the requirement that the government offer competent proof at trial. And, as previously argued, that testimony must be detailed enough to provide the jury with a basis for concluding that the iMessage crossed state lines, which requires specialized knowledge falling within Rule 702.[2] The government's discussion of *United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020), ignores its most relevant point for present purposes: its suggestion that proof that a particular instant messaging app used the internet required expert testimony.

---

[2] That the cases on which O'Donovan relies arose in different contexts, GB:30, does not detract from the central point: that how cell phones communicate with each other via text messages is a matter for expert testimony.

*See id.* at 50 n.13.

## 2.  **Rule 701.**

This Court's review is for abuse of discretion, not plain error as the government contends. GB:31, 32-33. Before Davis testified, the defense objected that  the government should have called someone with personal knowledge rather than Davis, to which the court responded that "we'll see if he does," App:535; *see* App:537 (court says, "we'll see what the witness knows"). Thus, the court clearly understood that O'Donovan was lodging a lack-of-personal-knowledge objection. Thereafter, counsel focused his cross-examination of Davis on showing Davis' lack of personal knowledge. App:543-46. When counsel moved to strike Davis' testimony, the basis for that motion was obvious, and the issue was, accordingly, preserved. *See, e.g., United States v. Pereira*, 848 F.3d 17, 26-27 (1st Cir. 2017)(objection preserved where the defense "demonstrate[d] . . . that the ground for the objection was obvious from the context in which it was made").

The government's emphasis on Davis' training and experience, GB:31-32, proves too much—it demonstrates that his testimony was based on specialized training falling within Rule 702. It also does not rebut the essential point: that his testimony was based on hearsay, *i.e.*, what he was told by unknown others during his training, which could have been well over a decade earlier. *See* App:355-56. *United*

*States v. Brown*, 669 F.3d 10 (1st Cir. 2012), GB:31, does not support the government's position; there, the evidence indicated a number of ways in which the witness could have personally heard the threats about which he testified, and the defense cross-examination did not "contradict this inference" or provide a basis for a motion to strike. *Id.* at 22 & n.21. Nor does *United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994), aid the government's argument, as the witness' testimony was based on her personal knowledge of official bank documents. Notably, the government ignores this Court's decision in *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016), *see* AB:28, which provides considerably more pertinent precedent.

## II. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT O'DONOVAN'S CONVICTION ON COUNT ONE.

### A. The Evidence Did Not Suffice to Prove the Existence of a Scheme to Commit *Quid-Pro-Quo* Bribery as of April 26.

Buckley may have speculated regarding O'Donovan's intent, GB:21; App:238, 246, but that speculation stands in marked conflict with his repeated acknowledgments that O'Donovan never offered the Chief anything directly or through Buckley and instead asked for no more than that the Chief read Theory's application carefully, vote based on his independent assessment of its merits, and, if he thought Theory was a good candidate, convey his favorable opinion of Theory to the Mayor. App:180, 189, 205-06, 210-15, 221. Such speculation cannot substitute

for proof of O'Donovan's corrupt intent. Yes, O'Donovan offered money to Buckley, but the evidence did not suffice to prove that O'Donovan had, directly or even indirectly, offered a bribe *to the Chief* as of April 26.[3] O'Donovan's requests that Buckley ask the Chief to give Theory a fair shake and a high score fall comfortably within the scope of protected lobbying and do not rationally support an inference of intent to bribe. That O'Donovan hoped that if the Chief viewed Theory's application favorably (the only circumstance in which O'Donovan asked that Buckley ask the Chief do anything), he would advocate for Theory with the Mayor, GB:21, also provides no indication of an intent to commit bribery. Asking the Chief to convey to the Mayor his legitimate belief in Theory's merits also falls within the heart of protected lobbying, and the Chief, as Medford's head law enforcement officer, had an obvious interest in ensuring the selection of the candidates best geared to the security and safety of the community.

There was no reason for O'Donovan to fear talking on the telephone, and nothing clandestine about a meeting in a parking lot in a busy area near O'Donovan's law office. *See* App:99. And the government's suggestion of furtiveness is belied by the fact that the April 26 meeting took place outside O'Donovan's home, in broad

---

[3] *United States v. Bustamante*, 45 F.3d 933, 938 (5th Cir. 1995), GB:21, is thus beside the point, as the payment in that case was made directly to the public official.

daylight and in full view of his neighbors, App:207-08, as did the September 29 meeting, during which O'Donovan even conversed with a neighbor and introduced the neighbor to Buckley. App:123-24, 229, 682. O'Donovan's expressing concern about alienating the Chief and advising Buckley to be careful, GB:22, occurred during their February 22 conversation, during which Buckley testified that O'Donovan had not asked him to do anything more than ask the Chief to review Theory's application and rank it according to his own evaluation of its merits. App:206. There was similarly nothing furtive about O'Donovan's direct question to Buckley about whether he had "[gotten] a black eye," GB:22, said in a context in which Buckley said O'Donovan was "joking around." App:115.

Ultimately, the government's arguments founder on one essential point: the absence of evidence that as of April 26, O'Donovan had offered (or even intended to offer) anything to the Chief or that a bribery scheme existed as of that date.[4] There could be no "winks and nods" here, GB:24-25, as O'Donovan never had any communication with the Chief, even indirectly, that could be rationally so interpreted. When read in context, O'Donovan's reference to Buckley's having broached the subject to the Chief (not "praise" for having done so), GB:23-25, refers to Theory's

---

[4] As the Supreme Court cases cited by the government, GB:23, attest, success of the scheme may not be required, but proof of its existence certainly is.

application, which was filed the very next day, App:310-11, and not to an offer to bribe the Chief in exchange for official action on Theory's application. App:658-64. If O'Donovan understood as of April 26 that the Chief knew that Buckley would be paid, why did the FBI feel the need to have Buckley tell O'Donovan so on September 14 and then offer an explicit *quid pro quo* on September 29? There is nothing *per se* illegal in Buckley's being paid for lobbying his brother or in the Chief's knowing that Buckley would be paid. Even if the Chief knew that Buckley would be paid for his lobbying services, that does not translate to an offer *to the Chief* of anything of value in exchange for his official acts. The evidence does not, therefore, show that "O'Donovan had fully offered his bribe as of April 26." GB:23.[5] The government's contrary arguments rest upon impermissible "stack[ing of] inference upon inference in order to uphold the jury's verdict," *United States v. Guerrero-Narvaez*, 29 F.4th 1, 9 (1st Cir. 2022), and should be rejected.

---

[5] The out-of-circuit precedents on which the government relies, GB:23-24, are both inconsistent with this Court's jurisprudence, *see* AB:31, and readily distinguishable from this case. In *United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2008), the official accepted money from the defendant for years, although never expressly agreeing to do anything. In *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013)*,* the defendant treated public officials to dinners, drinks, travel, concerts, and sporting events, and those officials often took actions that were favorable to the defendant's clients. In *United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007), the defendant legislator gave hospital representatives reason to understand that his assistance in legislative matters affecting the hospital would be forthcoming if the hospital agreed to hire workers from his temp agency.

## B. Even if Such a Scheme Existed, the April 26 iMessage Was Not Part of its Execution.

The government's argument rests on the theory that O'Donovan sent the April 26 iMessage because he feared falling out of Theory's good graces. GB:26-27. That theory, however, finds no support in the evidence.[6] The government's suggestion that O'Donovan conned Pollock into hiring him by misrepresenting his Medford connections rests on a misreading of the record. Quite the contrary—O'Donovan had extensive experience working in Medford; he knew several city councillors, the building inspector, and others in city government, App:281, and used those contacts to assist Theory in formulating its application. App:288-89, 291, 337. He was, contrary to the government's argument, open with Pollock about who he knew and did not know, including telling him that he did not have a relationship with the new Mayor. App:289. O'Donovan's contractual obligations to Theory were to liaise with local authorities as necessary to secure permitting approval, assist in preparing

---

[6] Pollock did testify that a 1% share of the profits would amount to $100,000 to $200,000 annually, GB:5, 26, but provided no basis for his speculative estimate, which presupposed profits of $10,000,000-$20,000,000. O'Donovan's $7,500 monthly retainer ended when Theory was awarded an HCA, App:385, and there was no evidence regarding how long it would be before the cannabis shop was open for business and what its actual profits would have been. At sentencing, the court pegged the loss at only $40,000-$95,000. Doc. 182 at 6. Nor did O'Donovan "threaten" Pollock into accepting his compensation proposal, GB:5; all he did was tell Pollock that another competitor was also seeking to retain his services. App:287.

Theory's application, and appearing before local entities as needed. App:283, 300, 334-35, 342-43. O'Donovan had been assiduously performing those duties, which had nothing to do with whether he knew members of the CAC, to Theory's apparent complete satisfaction. He had, in fact, been "working . . . hard," working with Theory in developing its massive application, which was to be filed the next day, and lining up local support. App:305, 310. There were no "faux" lobbying efforts here, GB:28, and no reason why O'Donovan would have thought that he needed to send Pollock a lulling communication. *See United States v. Tavares*, 844 F.3d 46, 59-61 (1st Cir. 2016). The April 26 iMessage was so totally disassociated from any scheme to bribe the Chief that it cannot provide the basis for an honest services fraud conviction.[7]

## III. THE DISTRICT COURT ERRED IN DECLINING TO INSTRUCT THE JURY ON THE DEFENSE OF ENTRAPMENT.

### A. Judicial Estoppel is Inapplicable.

The court below did not rely on judicial estoppel principles, nor did the government argue judicial estoppel in opposing an entrapment instruction. And there is good reason why not: O'Donovan never "press[ed] a claim that [was] inconsistent with" any earlier position he had taken. *See* GB:35. The government's questioning

---

[7] *Schmuck v. United States*, 489 U.S. 705, 714 (1989), the sole case on which the government relies, GB:27-28, does not support its position because the mailings in question there were an "essential step" without which the fraud could not succeed.

of Buckley about tax fraud occurred during Buckley's direct examination, App:154-55, and counsel later asked that the court instruct the jury that tax fraud was not an issue in the case. App:274. His objection had nothing to do with whether the government could properly introduce predisposition evidence, and he certainly did not invite a finding that the record did not support an entrapment theory. GB:36. Indeed, most of the cross-examination of Buckley that preceded this colloquy was devoted to showing all the ways that the FBI, through Buckley, had manipulated O'Donovan. In response to the government's mention that tax fraud evidence would be admissible as evidence of predisposition, the court noted that defense counsel had not opened on an entrapment theory, App:274-75, which was not actually true, as counsel told the jury in his opening that it would hear evidence that Buckley's words were scripted by the FBI to entice O'Donovan to cross the line from politics to crime. App:70. Nothing that counsel said remotely suggested that he was disavowing an entrapment defense. Notably, the court said that it "would see how the defense develops," App:275, *and the government never afterwards sought to introduce any predisposition evidence or to reopen the issue.*

Certainly the government was entitled to present proper predisposition evidence, but nothing that counsel said or did prevented it from seeking to do so. The only evidence to which the government points is statements by O'Donovan that it

contended suggested his willingness to commit tax fraud, but those statements were admitted into evidence through Buckley. App:154-55. Critically, however, a willingness to commit tax fraud would not be admissible as evidence that O'Donovan was predisposed to commit honest services fraud or federal program bribery, as predisposition evidence must relate *to the charged crime*. *United States v. Davila-Nieves*, 670 F.3d 1, 9 (1st Cir. 2012). *See, e.g., United States v. Joost*, 92 F.3d 7, 14 (1st Cir. 1996)("[D]efendant was certainly predisposed to commit the crime of counterfeiting, but the question is whether he was predisposed to commit the crime of procuring and possessing a firearm . . . ."). O'Donovan did not, therefore, "oppose predisposition evidence," GB:37, as the government never offered any.

### B.    There Was No Waiver.

Like its meritless judicial estoppel argument, the government's waiver argument simply seeks to evade the force of O'Donovan's arguments why an entrapment instruction was required. Entrapment is a process, and September 29, when the FBI had Buckley make the offer of a *quid-pro-quo* agreement with the Chief explicit, was the culmination of that process, which had been ongoing for months through an escalating series of FBI-scripted lies. It would have been futile to argue that O'Donovan's entrapment occurred on a single date, disconnected from everything that had gone before. In any event, Count Two charged honest services

fraud on October 7, 2021, and the federal program bribery charged in Count Three focused on the period beginning in September 2021, so even under the government's waiver argument, an entrapment defense would still be preserved as to those counts.

### C.   O'Donovan Was Entitled to an Entrapment Instruction.

The fundamental flaw in the government's arguments is that, although the government purports to consider the evidence "through a defense-favorable lens," GB:38, it then proceeds to discuss the evidence in the light most favorable to the government.[8] There was no offer of "quid-pro-quo terms" by O'Donovan on February 22. He offered payment *to Buckley* to retain his services to lobby the Chief, not to the Chief as a bribe, and only increased the amount of the potential payment in response to Buckley's request that he "sweeten the deal." App:652. That payment was conditioned on Theory's success (not upon receiving favorable treatment from the Chief) does not convert lobbying efforts into an offer of a *quid pro quo* to the Chief in exchange for favorable treatment. How these and subsequent statements should be interpreted in light of Buckley's lies and manipulations was a matter for a properly instructed jury.

---

[8] The government urges the Court to watch the videos of the recorded conversations. GB:39. If the Court does so, it should be alert to all the ways in which Buckley, whom O'Donovan believed to be a friend, engaged in an escalating pattern of lies and manipulation at the FBI's behest. *See* AB:40-49.

As O'Donovan has shown, contrary to the government's argument, GB:39, O'Donovan did not introduce the subject of a *quid pro quo* on September 14. *See* AB:64-65. Once again, the government relies on selective cherry-picked snippets divorced from their contexts. It was Buckley who, on the FBI's instructions, asked for the September 14 meeting, raised the matter of payment, claimed that the former Mayor had approached the Chief to lobby the Chief on behalf of a competitor, thus preying upon O'Donovan's fears regarding local influence, lied about having financial problems, and informed O'Donovan that he had told the Chief that he (Buckley) would be paid. App:130-31, 140-41, 222-25, 669-71. Immediately after telling Buckley to "be careful how you say it to your brother," GB:39, O'Donovan added that he did not want to put the Chief "in a bad spot,"and then twice asked Buckley to reiterate to the Chief that he should not vote for Theory if he did not genuinely believe that Theory merited it, App:670, hardly the words of a man intent on bribing the Chief to obtain a high vote. He also told Buckley that his requests were operative *only* "*if* [the Chief] was gonna vote for [Theory] anyway" and give it a "high vote." App:670 (emphasis added).

That O'Donovan hoped that the Chief would urge Theory's merits to the Mayor is hardly indicative of a *bribery* scheme. GB:40. This is a logical extension of the lobbying function, and, if the Chief regarded Theory's application highly, he would

have had an obvious interest in advising the Mayor of its merits, particularly as an important part of the vetting process was the adequacy of the company's proposed security plans. App:257, 348-49. Similarly, O'Donovan's statements expressing concern about the Chief's potential negative reaction, GB:40, are at least equally consistent with concern, based on the Chief's reputation for integrity and his known antipathy to cannabis, that the Chief would take amiss *any* effort to influence his decision, even the urging of his brother. By the same token, O'Donovan's remarks about someone else trying to lobby the Chief directly, GB:41, can also be interpreted as an expression of belief that he was *not* pursuing an "illegal channel." Based on the evidence, a properly instructed jury could also conclude that the subject of untraceable payment originated with Buckley, not O'Donovan, *see* AB:7, and that O'Donovan was not seeking to have Theory fund a bribe, GB:41, but instead was trying to obtain Theory's payment of the lobbying fee that O'Donovan had promised Buckley. As of September 29, GB:42, the government's entrapment of O'Donovan was complete.

   It bears repeating that the issue here is not the sufficiency of the evidence to support O'Donovan's convictions. The question is whether he has met his "modest burden" of demonstrating his entitlement to an entrapment instruction, in which context all reasonable inferences must be drawn in *his*, not the government's, favor.

AB:38. O'Donovan has done so, and whether the government improperly induced the commission of the crimes charged and whether he was predisposed to commit *quid-pro-quo* bribery were questions for the jury.

The government argues that the failure to give an entrapment instruction was harmless error. GB:42-43. This Court does not, however, apply harmless error analysis where entrapment instructions have been erroneously refused. Instead, "[b]ecause the defendant was entitled to, but did not receive, a jury charge on entrapment, his conviction cannot stand." *United States v. Rodriguez*, 858 F.2d 809, 817 (1st Cir. 1988). *See, e.g., United States v. Gamache*, 156 F.3d 1, 12 (1st Cir. 1998)(vacating conviction where defendant was improperly refused an entrapment instruction without reference to harmless error); *Joost*, 92 F.3d at 13-14 (defendant "must be retried" when he meets his burden to show entitlement to an entrapment defense). Where an entrapment instruction was warranted but not given, "the jury was not in a position to fairly evaluate the defendant's case, . . . as it did not know that the government was required to prove beyond a reasonable doubt that either no improper inducement took place, or that [the defendant] was predisposed to commit the offense." *United States v. Perez-Rodriguez*, 13 F.4th 1, 30 (1st Cir. 2021). Those words are especially true here, as the jury, rather than being instructed on the elements of the entrapment defense, was told that Buckley's lies constituted

20

permissible government conduct and had absolutely no bearing on its determination of O'Donovan's guilt of the offenses charged.

The government's harmless error argument would be meritless in any event. It focuses solely on the jury's Count One verdict, GB:42-43, but for the reasons addressed in O'Donovan's opening brief and Section II, *supra*, the evidence was insufficient to support O'Donovan's conviction on that count, and the jury's verdict was, moreover, infected by the court's erroneous instructions. We simply do not know how the jury would have regarded Count One had it been given an entrapment instruction and had counsel not been precluded by the court from arguing entrapment to the jury. The April 26 meeting (the date charged in Count One) was arranged by Buckley on the fictional premise that he had spoken to the Chief, and at that meeting Buckley, on the FBI's instructions, stoked O'Donovan's fears that Theory's application might not receive the attention it deserved by telling him that the Chief hated being on the CAC. As demonstrated in O'Donovan's opening brief, the entrapment of O'Donovan was well underway at this point, and a properly instructed jury and counsel able to argue entrapment could well have produced a different result.

## IV. THE COURT ERRED IN EXCLUDING THE TESTIMONY OF PROFFERED DEFENSE WITNESSES.

The government appears to concede that Sarcia's testimony was admissible if

there was a "meaningful relationship" between Carr's statements and O'Donovan's "actual, subjective beliefs." GB:44. That relationship, as O'Donovan has demonstrated, AB:53-55, was patently obvious: O'Donovan's knowing that the Mayor regarded Theory's application favorably was directly related to O'Donovan's subjective beliefs about Theory's prospects for success and, correspondingly, whether he would have been motivated to, and intended to, commit bribery to achieve the result which was already forecast.

This has nothing to do with O'Donovan's belief that Theory was a top contender, GB:44-45, and everything to do with O'Donovan's knowledge that the Mayor was of the same opinion. Contrary to the government's argument, the Mayor's positive view of Theory's application sheds considerable light on O'Donovan's motivation to commit bribery. GB:45-46. The selection was a two-step process, but the first step was purely advisory; the Mayor had the final say. O'Donovan's knowledge of the Mayor's favorable opinion of Theory's application would have allayed O'Donovan's expressed fears that local influence might prevail over Theory's superior merits and sharply undercut the government's arguments that O'Donovan's hope that the Chief would advocate for Theory with the Mayor showed O'Donovan's intent to commit bribery. The same is true with respect to the government's contention regarding the timing of O'Donovan's conversations with Sarcia. GB:46-

47. The government would be free to argue at trial the contrary inferences it suggests, GB:45-46, but they do not render the evidence inadmissible. The government cites no authority to support its inadmissibility argument. It requires no great inferential leap for a jury to conclude that such important knowledge, gained only two months earlier, could have impacted O'Donovan's state of mind in September.[9] Indeed, O'Donovan specifically references the Mayor's favorable view of Theory's application on October 11, 2021. App:706-07.

Lastly, the government contends that the court also excluded the evidence under Rule 403, citing the court's reasons for denying release pending appeal, issued after O'Donovan's opening brief was originally filed. The court made no mention of Rule 403 at trial, and its after-the-fact Rule 403 rationale (not expressed "on-the-scene," GB:47)—which the government does not press—is also erroneous. As O'Donovan has explained, there was nothing "peripheral" about evidence relating

_____

[9] The cases on which the government relies, GB:47, do not support its position. In *United States v. Dynalectric Co.*, 859 F.2d 1559, 1574 n.19 (11th Cir. 1988), there was no evidence that the defendants knew of the economic data which they wished to introduce when they set their prices. In *United States v. Simon*, 12 F.4th 1, 55 (1st Cir. 2021), because the defendant had "never been privy to the findings of the investigation, those findings could not have informed his subjective beliefs." In *United States v. Wilson*, 798 F.2d 509, 515-16 (1st Cir. 1986), the defendant sought to introduce evidence of something that occurred in 1982 to show his state of mind several years earlier.

directly to O'Donovan's *mens rea*, and, as the defense proffer showed, the excluded testimony would have been simple and straightforward and would not have confused the jury, especially as the court could have added an explanation of the purpose for which the testimony was admitted.

The government's harmless error arguments, which rest solely on the jury's verdict on Count One, GB:48-49, should be rejected for the reasons addressed at page 21, *supra*.

## V.     THE OFFICIAL ACT REQUIREMENT.

The government's position is inconsistent with arguments made by the government during the recent oral argument in *Snyder v. United States*, No.23-108, in which the government, seeking to convince the Court that §666 encompasses gratuities as well as bribes and answer the Court's vagueness and overbreadth concerns, described §666 as including an official act requirement, something that Justice SotoMayor also seemed to assume. *Snyder* Transcript at 26-27, 39-40, 70, available at https://www.supremecourt.gov/oral_arguments/ argument_transcripts/2023/23-108_4hd5.pdf.

Most of the government's arguments have been anticipated and answered in O'Donovan's opening brief. AB:59-67. O'Donovan has already explained why the absence of the words "official act" should not be dispositive, AB:59-60, and nothing

in *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), which addressed an entirely different question, undermines those arguments. The question why Congress would have intended to subject state and local officials to broader criminal liability than federal officers remains a valid one. Yes, Congress has a valid interest in protecting federal funds, GB:52, but the people most responsible for how they are expended are federal officials. As the Fifth Circuit has recognized, "Congress' interest in federal officials taking bribes is higher than its interest in local officials (with some connection to federal funds) doing the same." *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022).

The error was not harmless for all the reasons set forth at pages 67-69 of O'Donovan's opening brief.

## VI.   THE COURT'S INSTRUCTIONS TO THE JURY WERE ERRONEOUS.

### A.   The Material Misstatements Instruction.

The error here was not that the instructions added an additional element that the government was required to prove but rather that they opened an *alternative*—and improper—basis for conviction. AB:71-72. O'Donovan has not argued that the instructions "invited the jury to consider" his misrepresentations, GB:57, but that they invited the jury *to convict* based on the misrepresentations that the government stressed to the jury immediately following these instructions.

## B. The *Quid-Pro-Quo* Requirement.

The government's argument ignores both the indictment's identification of the crime charged as O'Donovan's believing that he had "reached a corrupt agreement with . . . the Chief," App:4, 6, and the clear language of *United States v. McDonough*, 727 F.3d 143, 153 (1st Cir. 2013), that "the government must prove that an agreement for a quid pro quo existed." *See, e.g., United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007)("[R]equiring a jury to find a quid pro quo, as governing law does, ensures that a particular payment is made in exchange *for a commitment* to perform official acts to benefit the payor in the future." (emphasis added)). The portion of *McDonough* on which the government relies, GB:59, was addressing a different issue than that here: whether an intent to influence official conduct required an intent to cause the official to act differently than he would otherwise have done. The question here is whether the instructions properly defined the *quid-pro-quo* requirement, not whether they correctly encapsulated the meaning of "influence." They did not for the reasons addressed in O'Donovan's opening brief at pages 72-75.[10]

The error was not harmless. AB:74-75. In arguing to the contrary, the

---

[10] O'Donovan has already explained why *Suhl* and *Ring*, GB:59-60, are inapposite. *See* page 12 n.5, *supra*.

government relies solely on the October 11 conversation, GB:60, but even as late as that date, O'Donovan was expressing *his hope* that Theory would score the highest and that the Chief would talk to the Mayor, App:708, not his understanding that the Chief had committed to doing so, and said that he thought that since the Mayor liked Theory's application, the Chief probably did too. App:706.

### C. The Erroneous "Quo" Instruction.[11]

Once again, the government ignores critical language from the authority on which it relies: the description of the *quid pro quo* in *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), as "the agreement to exchange [a thing of value] for official action." The instruction was error and not harmless for the reasons discussed at pages 75-76 of O'Donovan's opening brief.

---

[11] The Court's review is not for plain error, as the objection broadly encompassed the entire instruction. *See* App:574.

# CONCLUSION

O'Donovan's convictions on Counts One and Two should be reversed and his conviction on Count Three vacated and the matter remanded for a new trial. At minimum, O'Donovan's convictions on all counts should be vacated and a new trial ordered.

Respectfully submitted,
By his attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

———————————

No. 24-1200

———————————

UNITED STATES OF AMERICA,
Appellee

v.

SEAN O'DONOVAN,

Defendant-Appellant

———————————

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND
LENGTH LIMITATIONS**

———————————

This Reply Brief has been prepared using:

14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:

WordPerfect Office 2021. 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's Reply Brief contains, in total: 6,413 words.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

**/s/ Kimberly Homan**
Kimberly Homan

**CERTIFICATE OF SERVICE**

I, Kimberly Homan, hereby certify that on this 3rd day of May, 2024, the Reply Brief of Defendant-Appellant Sean O'Donovan was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Kimberly Homan**
Kimberly Homan